[No. B008999. Second Dist., Div. Seven. May 2, 1986.]

BRUCE GARDNER, Plaintiff and Respondent, v.
DOWNTOWN PORSCHE AUDI, Defendant and Appellant.

COUNSEL

Rubin, Eagan & Feder, Don Erik Franzen and Stephen J. Tully for Defendant and Appellant.

Sam B. Dunford for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—This case raises an issue common in daily life yet one which has received almost no attention in California appellate decisions.

May an automobile repair garage avoid liability for its negligence by having car owners sign a waiver form when they leave their cars with the garage? In this opinion, we hold they cannot and affirm the judgment below.

## FACTS AND PROCEEDINGS BELOW

In late June 1978, respondent Bruce Gardner (Gardner) took his 1976 Porsche 911 automobile to be repaired at appellant Downtown Porsche Audi (Downtown). The record on appeal suggests Gardner signed a form repair order bearing the disclaimer "NOT RESPONSIBLE FOR LOSS OR DAMAGE TO CARS OR ARTICLES LEFT IN CARS IN CASE OF FIRE, THEFT OR ANY OTHER CAUSE BEYOND OUR CONTROL." For purposes of this appeal, Downtown concedes it was negligent in the care and safekeeping of Gardner's vehicle. While it was parked in the repair garage someone stole the 1976 Porsche. Gardner sued Downtown for failing to redeliver this car.

On September 16, 1983, the case was tried before a judge. Judgment was entered on December 14, 1983, awarding Gardner $16,000 plus costs. Downtown filed a notice of appeal on December 31, 1984, based on the judgment roll. The time for briefing expired on December 13, 1985.

## DISCUSSION

Downtown concedes negligence but argues the disclaimer absolves it of liability for this failure to exercise due care. Assuming the truth of Downtown's contention Gardner signed a repair slip containing this exculpatory language, and even assuming he read and understood it, we find the attempted exemption from liability to be against public policy and thus ineffective to excuse Downtown's negligence.

In the absence of a disclaimer the duties and liabilities of a bailee for hire—such as Downtown—are clear. Unless it can redeliver the subject of the bailment—in this instance, the 1976 Porsche—the bailee must prove it exercised due care in its care and custody of this property. If it fails to establish the absence of negligence the bailee is liable to the bailor for any damages suffered due to the failure to redeliver the bailed property. (3 Witkin, Summary of Cal. Law (8th ed. 1973) Personal Property, § 137, and cases cited therein.) This is true even where a third person stole the subject of the bailment and thus made redelivery impossible. (*Perera* v. *Panama-Pacific Int. Exp. Co.* (1918) 179 Cal. 63 [175 P. 454]; *England* v. *Lyon Fireproof Storage Co.* (1928) 94 Cal.App. 562 [271 P. 532]; *Greenberg Bros., Inc.* v. *Ernest W. Hahn, Inc.* (1966) 246 Cal.App.2d 529 [54 Cal.Rptr. 770]; *Beetson* v. *Hollywood Athletic Club* (1930) 109 Cal.App. 715 [293 P. 821].)

It is these well-settled duties and liabilities which Downtown sought to avoid by asking customers to sign a form which said it was "not responsible for loss (of) cars . . . in case of . . . theft . . . ."[1]

■ Traditionally the law has looked carefully and with some skepticism at those who attempt to contract away their legal liability for the commission of torts. (Prosser & Keeton, Torts (5th ed. 1984) pp. 482-483.) This general policy of the common law found legislative expression early in California's history with the enactment of Civil Code section 1668. This 1872 statute reads: "[CERTAIN CONTRACTS UNLAWFUL.] All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, *whether willful or negligent,* are against the policy of the law." (Civ. Code, § 1668, italics added.)

This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law. Less clear was the status of negligent violations of *common law* standards of care. While acknowledging some conflict in the cases, Witkin concludes California now follows the modern view of the Restatement of Contracts—"a contract exempting from liability for *ordinary* negligence is valid where *no public interest* is involved . . . and no statute expressly prohibits it . . . ." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 485, p. 411, italics added.)

The converse is also true, however. Under Civil Code section 1668 an automobile repair garage cannot exempt itself from liability even for ordinary negligence if the service it provides implicates the public interest. In a leading case striking down exculpatory clauses in hospital admission forms, *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693], the Supreme Court set forth

---

[1]Since we decide this case on broader principles we need not consider the effect of the peculiar language of this particular disclaimer. It purports to exculpate Downtown for liability only for "fire, theft or any other cause *beyond our control.*" This language is open to the interpretation Downtown remains liable for thefts which are *within* its control, that is, those which would not have happened but for Downtown's negligence. Indeed it is difficult to construe any loss as being beyond someone's control if that someone could have prevented it by taking due care. Conceivably, Downtown could argue the "beyond our control" clause only modifies the "other cause" term and not the words "fire" or "theft." But a more reasonable construction is that "beyond our control" is used to characterize the general category of losses which are exempted from liability with "fire" and "theft" merely being examples of this general category. If so, Downtown can claim exemption from liability under this disclaimer only for those thefts which are beyond its control and not those facilitated by its negligence.

six characteristics typical of contracts affecting the public interest.[2] "'(1) It concerns a business of a type generally thought suitable for public regulation. (2) The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. (3) The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. (4) As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. (5) In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence. (6) Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.'" (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d at pp. 98-101, quoted in *Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 518 [143 Cal.Rptr. 247, 573 P.2d 465].) The Supreme Court emphasized a contract could involve the public interest even if it did not meet each and every one of these six criteria. (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d at p. 101.) But it has not told us how many have to be satisfied—or which ones—before exculpatory clauses become unenforceable. Fortunately, we need not address this thorny problem since we find the automobile repair contract in the instant case exhibits all six characteristics outlined in the *Tunkl* opinion.

---

[2] In *Tunkl* the Supreme Court pointed out the lack of uniformity in prior California opinions on the issue of whether and when a party can contract away its liability for simple negligence. Thus it is possible to find authority on both sides as to many kinds of transactions. For example, exculpatory clauses in bailment contracts were struck down as violative of public policy in *Dieterle* v. *Bekin* (1904) 143 Cal. 683 [77 P. 664] and *England* v. *Lyon Fireproof Storage Co.* (1928) 94 Cal.App. 562 [271 P. 532]. On the other hand, an exculpatory clause was upheld in another bailment situation in *Northwestern M.F. Assn.* v. *Pacific Co.* (1921) 187 Cal. 38, 41 [200 P. 934] in an opinion stressing this was a business contract. An exculpatory clause which only limited the value that could be recovered rather than eliminating liability entirely was upheld in *George* v. *Bekins Van & Storage Co.* (1949) 33 Cal.2d 834 [205 P.2d 1037].

The *Tunkl* court sought to impose some order on this chaos by expressly holding an exculpatory clause is ineffective to excuse responsibility for ordinary negligence where the contract affects the public interest and then defining in detail the characteristics of a contract affecting the public interest. (60 Cal.2d at pp. 95-101.) As a result, the pre-*Tunkl* decisions are of limited value in deciding whether and when exculpatory clauses are enforceable under Civil Code section 1668. If a certain specie of agreement fully satisfies the *Tunkl* characteristics, it "affects the public interest" no matter how it may have been classified in earlier years. Thus, courts may well strike down any exculpatory clauses in these agreements despite pre-*Tunkl* authority approving such clauses in this category of contract. (See, e.g., *Henrioulle* v. *Marin Ventures, Inc.* (1978) 20 Cal.3d 512 [143 Cal.Rptr. 247, 573 P.2d 465], where a unanimous Supreme Court applied the *Tunkl* criteria and overturned clear prior authority holding residential leases did not involve the public interest and thus could validly contain exculpatory clauses, *Barkett* v. *Brucato* (1953) 122 Cal.App.2d 264 [264 P.2d 978].)

To begin with, automobile repair shops are in a "business of a type . . . thought suitable for public regulation" in the State of California. They are licensed by the state and their performance is regulated by the Bureau of Automotive Repair of the State Department of Consumer Affairs. (See Automotive Repair Act, Bus. & Prof. Code, § 9880 et seq.)

*Secondly,* these repair shops are most definitely engaged in "performing a service of great importance to the public, . . ." and, moreover, one which is a "matter of practical *necessity*" for nearly *all* not just "*some* members of the public." At oral argument respondent suggested only the most vital, life-and-death functions were sufficiently in the "public interest" to satisfy this criterion. But the *Tunkl* opinion does not support this reading. It makes plain the real purpose of this part of the test is to ensure that consumers of the service are truly in an inferior bargaining position. As the Supreme Court said in *Tunkl*: "Since the service is one which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk of another's negligence. The public policy of this state has been, in substance, to posit the risk of negligence upon the actor; in instances in which this policy has been abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 101.) Thus, this element of the *Tunkl* test appears to boil down to the following question: Is the service merely an optional item consumers can do without if they don't want to waive their rights to recover for negligence or is it something they need enough so they have little choice if the provider attaches a liability disclaimer?

In any event, even accepting respondent's proposed test of a vital, life-or-death function, automobile repair services would qualify. The modern citizen lives—and all too frequently dies—by the automobile.[3] Members of the general public need cars not merely for discretionary recreational purposes but to get to and from their places of employment, to reach the stores where they can purchase the necessities—as well as the frivolities—of life, and the like.[4] An out of repair automobile is an unreliable means of trans-

---

[3]As of 1984, the state of California alone had nearly 19 million motor vehicles including 14,730,000 private automobiles. This works out to 575 vehicles for every 1,000 people in the state or better than 1 vehicle for every 2 Californians. (U.S. Bureau of Census, Statistical Abstract of the United States, 1986, at p. 597, table 1040.) Meantime every year about 5,000 Californians lose their lives in motor vehicle accidents. (*Id.,* at table No. 1047, p. 600.)

[4]In 1983, 30.8 percent of vehicle trips and 34.5 percent of total vehicle miles were work related. Another 38.3 percent of trips and 28.8 percent of vehicle miles were for the purpose of shopping and other essential family business. The remaining use of the automobile was for visiting friends and relatives, going to church or school, vacation trips, and other social and recreational purposes. (Statistical Abstract of the United States, *supra,* at p. 604, table No. 1056.)

portation. Moreover, it is a dangerous one as well—to pedestrians and other drivers not just the owner. What is true of modern society in general is doubly true in Southern California, the capital of the motor vehicle. Indeed it is virtually impossible to exist in the Los Angeles area without a fully operational automobile. Thus, except for the few who can afford to buy a new car every time the ash trays fill up, people in this area find the automobile repair business a "service of great importance" and a "practical necessity."[5]

*Thirdly,* Downtown held itself "out as willing to perform" this important service "for any member of the public" or at least for any member of the public who fell within the "established standard" of owning an automobile of the type it was equipped to repair, in this case a Porsche.

*Fourthly,* Downtown indisputably "possesses a decisive advantage of bargaining strength against" Gardner or almost "any member of the public who seeks [its] services." Like the hospital in *Tunkl* it is one of a relatively small number of entities dispensing a service which is a "practical necessity" to a large number of consumers.

*Fifthly,* it is apparent Downtown "confronts the public with a standardized adhesion contract of exculpation." The exculpatory language is incorporated in the printed form "repair order" all customers are expected to sign before Downtown will begin work on the car. (Indeed, unable to produce the document Gardner actually signed, Downtown introduced a specimen of the form which all customers execute before a car is repaired and asks us to assume Gardner signed one exactly like it.)[6]

*Finally,* Gardner's Porsche was "placed under the control of" Downtown, "subject to the risk of carelessness by" Downtown and its employees. In order to make the repairs on Gardner's vehicle, Downtown took possession of the car and the keys to the car. During this period, the security of the automobile was entirely in Downtown's hands. If this dealer were careless in storing the vehicle or the keys, the Porsche would become an easy target for theft and there would be little the owner could do about it.

---

[5]Californians evidence this by averaging over twice as much in automobile repair bills as residents of other states. In 1982, California with about 10 percent of the nation's population was responsible for 22.6 percent of the total expended on automotive repair in the United States ($4.5 billion out of $20.4 billion). (Statistical Abstract of the United States, *supra,* at p. 789, table No. 789.)

[6]This is a judgment roll appeal. Hence we cannot be 100 percent certain Downtown failed to offer Gardner the opportunity "to pay additional fees and obtain protection against negligence." But Downtown makes no claim it did. In the absence of evidence—or even any allegations—on this issue and especially in a judgment roll appeal, we have no reason to assume the facts are favorable to appellant.

Based on application of the *Tunkl* criteria, we therefore conclude automobile repair contracts "affect the public interest."[7] It follows that clauses which exculpate repair firms for ordinary negligence in handling and securing vehicles under repair run afoul of Civil Code section 1668[8] and are "invalid as contrary to public policy." (*Henrioulle* v. *Marin Ventures, Inc., supra,* 20 Cal.3d at p. 518.)[9] Downtown did not mention Civil Code section 1668 (or § 1630.5) in its brief. Instead Downtown cites a 1937 appellate department opinion, *U Drive, etc.,* v. *System A. Parks* (1937) 28 Cal.App.2d Supp. 782 [71 P.2d 354], for the proposition a garage keeper may limit liability through an exculpatory clause. Although we distinguish this case on its facts we also find it no longer accurately states the law in California if it ever did.

In *U Drive* a parking lot issued tickets with the disclaimer "NOT RESPONSIBLE FOR CARS AFTER CLOSING TIME." A car was brought to the lot in the evening. When the driver returned after closing time he found the vehicle missing and no one around. The appellate department affirmed a judgment for the parking lot. "[W]e cannot say as a matter of law that the trial court was unjustified in its implied finding that by the contract of bailment it was agreed (impliedly) that defendant's responsibility as bailee should cease upon the closing of its park at 12 midnight. . . . Defendant's representative . . . testified that plaintiff's automobile was still on the lot when he . . . left at approximately 12:20 . . . . This evidence is legally sufficient to support the implied finding that defendant fully discharged the terms of its contract." (28 Cal.App.2d Supp. at p. 788.)

It might be tempting to distinguish *U Drive* on grounds it is a parking lot case and this is a repair garage case. However, this would be disingenous.

---

[7] We have not found a California case which squarely addresses whether an automobile repair business affects the public interest. However, we note *Nichols* v. *Hitchcock Motor Co.* (1937) 22 Cal.App.2d 151 [70 P.2d 654] which upheld a clause exempting an automobile dealer from liability for the negligence of its employee where the car owner asked the employee to pick up the car from his home and redeliver it after the repair was completed. Significantly, the court took pains to distinguish this pick up and delivery service from "that part of the defendant's business which was devoted to repairing . . . automobiles" which the court conceded arguendo "might possibly be regarded as a business 'impressed with a public use' . . . ." (22 Cal.App.2d at p. 159.)

[8] Although this particular contract was construed to create a bailment, that is not critical to our holding. If the garage could be held liable for its negligence *under any theory* in the absence of an exculpatory clause it can be held liable for this negligence despite the clause. A garage's attempt to exempt itself from liability for its negligence in caring for cars entrusted to it is unlawful irrespective of whether the contract is a bailment or purports to create some other legal relationship.

[9] Since we decide this case under Civil Code section 1668, we do not reach the question whether Downtown's exculpatory clause also runs afoul of Civil Code section 1630.5. This section reads in pertinent part "*any contract* of bailment *for the parking* . . . of a motor vehicle shall not exempt the bailee from liability, . . . for the theft of any motor vehicle . . . and the *keys are required* by such bailee *to be left* in the parked . . . vehicle." (Civ. Code, § 1630.5, italics added.)

In many situations parking lots appear to affect the public interest, too, perhaps not as much as repair garages but enough to satisfy the *Tunkl* criteria. The more significant difference is the nature of the disclaimer. In the instant case, Downtown sought to exculpate its negligence *during* the bailment. In contrast, as construed by the appellate department, the parking lot in *U Drive* used its disclaimer to *terminate* the bailment at a certain time. Since the bailment was over at midnight, the court found the bailee had no responsibility to protect the automobile after that time.

We have grave doubts a disclaimer such as the one in *U Drive* is lawful after the Legislature enacted Civil Code section 1630.5 (see fn. 9, *ante*). We have even graver reservations about the continued vitality of such a disclaimer under *Tunkl* and its progeny. But even assuming one could fix the *term* of a bailment through a simple disclaimer on a parking ticket this would not be precedent for allowing a disclaimer to excuse negligent performance *during* the bailment. *U Drive* does not and has never stood for the latter proposition. (But see, 3 Witkin, Summary of Cal., *supra*, (8th ed.) p. 1728 citing *U Drive* as the sole California precedent for the principle "[g]arage and parking lot . . . limitations (on liability) have been upheld . . . .") Nonetheless, in order to leave no doubt, we expressly disapprove the appellate department opinion in *U Drive* at least to the extent it is interpreted to allow garages to exempt themselves from liability for negligent care of the vehicles entrusted to them.

Downtown concedes it was negligent. We hold its attempt to avoid legal responsibility for this negligence is unavailing. It follows Downtown is liable for nondelivery of the subject of the bailment, Gardner's Porsche.

DISPOSITION

Accordingly, the judgment is affirmed.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied May 30, 1986, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 17, 1986. Lucas, J., did not participate therein.