[No. B152821. Second Dist., Div. Seven. Feb. 2, 2003.]

·GAVIN W., a Minor, etc., et al., Plaintiffs and Appellants, v.
YMCA OF METROPOLITAN LOS ANGELES et al., Defendants and
Respondents.

**COUNSEL**

Law Offices of Santiago, Rodnunsky & Jones, Artemio M. Santiago and David G. Jones for Plaintiffs and Appellants.

McCune & Harbor, Dana John McCune and Cindy Nguyen for Defendants and Respondents YMCA of Metropolitan Los Angeles, Laurie Pinkston and Mac Johnston.

Rehwald, Rameson, Lewis & Glasner, William Rehwald, Lawrence M. Glasner and Daniel R. Chaleff for Defendant and Respondent Camila Garcia.

**OPINION**

**PERLUSS, P. J.—**

*"Reports abound on the shortage of quality child-care options for California families. Rising rates of employment among mothers with young children, initiatives to boost youngsters' school readiness, and government's recent push to move single mothers from welfare to work continue to spur family demand for organized child-care and preschool programs."* (Jacobson et al., Understanding Child Care Demand and Supply Issues: New Lessons from Los Angeles (PACE 2001) at p. 1, italics added.)

*"For all working families, regardless of income, access to affordable, quality child care is essential. Yet millions of families in California, even*

*those who can afford to pay, struggle to find the child care they need. For some, the shortage of care is the main problem, since waiting lists for child care centers and family child care homes are commonplace. For others, the cost of care is a major burden. Waiting lists for subsidized child care are especially long, due to insufficient funding. As in 1996 and 1998, the supply of licensed care in 2000 met only a small fraction of the demand . . . ."* (California Child Care Resource &. Referral Network, The California Child Care Portfolio (2001) at p. 1 (Portfolio), italics added.)

For the vast majority of working families affordable, quality child care services are an indispensable ingredient of everyday life. Yet the demand in California for such services, particularly for children five years old and younger, far exceeds the supply. Under these circumstances contracts for child care services are necessarily "affected with a public interest." Accordingly, we hold a release of claims that purports to exculpate a child care provider from its own negligence is void as against public policy under *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693] (*Tunkl*).

### FACTUAL AND PROCEDURAL BACKGROUND

Gavin W. and his parents sued the YMCA of Metropolitan Los Angeles and certain YMCA employees[1] for damages arising from an incident of sexual touching between Gavin and another child in the YMCA's child care program. The trial court found a release of claims signed by Gavin's parents when they enrolled Gavin in the program barred their claims for negligence and breach of contract. A jury rejected the family's remaining claim. Gavin and his parents have appealed, contending the release is unenforceable. We agree.

#### a. *Gavin's Participation in the YMCA's Child Care Program*

Gavin W.'s parents, Calvin and Annette W., both worked full time. In June 1996 they enrolled Gavin in the child care program at the YMCA and, as part of the enrollment process, signed a waiver and release of liability in favor of the YMCA. In September 1997, when Gavin was not quite four years old, he and four-year-old Emilio B. were observed in the bathroom at the child care center with their pants down. Gavin later told his mother Emilio had made him put Emilio's penis in his mouth. Gavin's parents subsequently discovered Emilio had engaged in inappropriate sexual behavior with another boy at the child care center some weeks earlier and had reported being molested by his grandfather. They also learned the YMCA had been aware of those facts before the incident between Gavin and Emilio.

---

[1] Unless otherwise indicated, all defendants will be referred to collectively as "YMCA."

b. *The Lawsuit Against the YMCA*

Gavin and his parents filed suit against the YMCA for breach of contract, negligence,[2] fraud and several other intentional torts. The complaint alleged the YMCA had knowledge of Emilio's propensity towards inappropriate sexual conduct and should have taken steps to protect Gavin from Emilio.

Prior to trial, the YMCA moved for disposition of issues of law prior to issues of fact. (Code Civ. Proc., §§ 592 & 597.) One of the issues identified was the effect of the release signed by Gavin's parents on the negligence claims. The trial court granted the motion and requested supplemental briefs on the validity of the release.

The parties stipulated to the following facts with respect to the validity of the release:

"1. Gavin [W.] attended the YMCA child care program from June 10, 1996 to September 26, 1997. On the day of the alleged molestation, Gavin [W.] was three years and ten months old.

"2. The YMCA child care program is accessible to the general public.

"3. The YMCA child care program provides a benefit to the general public, specifically the provision of affordable child care.

"4. The child care industry is a regulated industry.

"5. Child care is not a recreational activity.

"6. Gavin [W.]'s parents left him in the care of YMCA and its agents for purposes of child care on a regular basis.

"7. The YMCA requires a release and waiver of liability and indemnity agreement which contains the same contractual language to be signed by the parents of all participants in its child care program.

"8. On June 4, 1996, plaintiffs Calvin and Annette [W.] signed the YMCA release and waiver of indemnity agreement."

The text of the release was not included in the stipulation, nor was a copy of the release attached to the briefs filed by the parties in the trial court. However, the parties agree the relevant portion of the release provides:

---

[2]The first amended complaint alleged causes of action for negligence and violation of Penal Code section 11166, which mandates reporting of suspected sexual abuse by child care workers (fifth cause of action), negligent supervision (sixth cause of action) and negligence, failure to warn (eighth cause of action).

"1. THE UNDERSIGNED, HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the YMCA, its directors, officers, employees, and agents (hereinafter referred to as 'releasees') from all liability to the undersigned, his personal representatives, assigns, heirs, and next of kin for any loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releasees or otherwise while the undersigned or such children is in, upon, or about the premises or any facilities or equipment therein or participating in the program affiliated with the YMCA.

"2. THE UNDERSIGNED HEREBY AGREES TO INDEMNIFY AND SAVE AND HOLD HARMLESS the releasees and each of them from any loss, liability, damage or cost they may incur due to the presence of the undersigned in, upon or about the YMCA premises or in any way observing or using any facilities or equipment of the YMCA or participating in any program affiliated with the YMCA whether caused by the negligence of the releasees or otherwise.

"3. THE UNDERSIGNED HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasee or otherwise while in, about or upon the premises of the YMCA and/or while using the premises or any facilities or equipment thereon or participating in any program affiliated with the YMCA."

c. *The Trial Court's Ruling Upholding the Release*

After briefing and oral argument, the trial court ruled the release was enforceable and not void as against public policy. It therefore dismissed the cause of action for breach of contract and the three negligence-based causes of action.

Ultimately, the court dismissed all of the claims asserted by Gavin and all but the fraud cause of action alleged by his parents. The jury then returned a unanimous verdict in favor of the YMCA on the remaining claim. Judgment was entered on August 3, 2001. This appeal followed.

DISCUSSION

1. *The Notice of Appeal Encompasses the Ruling on the YMCA Release*

Gavin and his parents filed a notice of appeal "from the Judgment entered on August 3, 2001." The YMCA erroneously contends this notice preserves

only the right to appeal from the jury's verdict and does not permit appellate review of the trial court's ruling on the special defense of the release.

Trial on the issue of the release was conducted pursuant to Code of Civil Procedure section 597, which provides that special defenses "not involving the merits of the plaintiff's cause of action but constituting a bar . . . to the prosecution thereof" may be tried "before the trial of any other issue in the case." An order resulting from the trial of a special defense under Code of Civil Procedure section 597 is nonappealable, but is properly challenged on appeal from the final judgment. (*Woodhouse v. Pacific Elec. Ry. Co.* (1952) 112 Cal.App.2d 22, 25 [245 P.2d 701].)

" 'It is only when the decision on the trial of the special defense is that the entire action is barred by a prior judgment that the court is empowered to render judgment for the defendant who has pleaded the special defense. [Citations.] When . . . the court proceeds to try a special defense which does not constitute a bar to the entire action before the trial of any other issue, and the decision on such special defense is in favor of the defendant, the proper procedure is to make a minute order to that effect, proceed to the trial of the remaining issues, make findings of fact and conclusions of law on all issues, and render judgment accordingly. In such a case, the decision of the court on the special defense and all rulings on it may be reviewed on appeal from the judgment.' [Citations.]" (*People v. Rath Packing Co.* (1978) 85 Cal.App.3d 308, 336 [149 Cal.Rptr. 431].) The appeal from the final judgment in this case properly encompassed the ruling on the trial of the special defense of the YMCA release. (See also Cal. Rules of Court, rule 1(a); *D'Avola v. Anderson* (1986) 47 Cal.App.4th 358, 361 [54 Cal.Rptr.2d 689] [sufficiency of notice of appeal should be construed liberally].)

2. *Standard of Review*

The parties agree we should review the ruling of the trial court de novo, relying on *YMCA of Metropolitan Los Angeles v. Superior Court* (1997) 55 Cal.App.4th 22 [63 Cal.Rptr.2d 612], in which Division One of this court considered the same YMCA release that is at issue in the present case. Division One held that to determine whether the release is invalid, we " 'conduct a de novo examination of the release document. Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, "construction of the instrument is a question of law, and the appellate court will independently construe the writing. [Citation.]" [Citation]' [Citation.]" (*Id.* at p. 26.) Although *YMCA of Metropolitan Los Angeles v. Superior Court, supra,* 55 Cal.App.4th 22, involved an appeal after summary judgment, rather than after trial of a special defense, we agree de

novo review is appropriate in this case where there were no disputed factual issues resolved in the trial court.

### 3. *The Trial Court Erred in Basing Its Ruling on the Specific Facts of the Alleged Negligence in This Case*

 The trial court apparently believed its duty was to decide whether the YMCA's release should be enforced to bar the specific negligence claims raised by Gavin and his parents: At the hearing on the validity of the release, the trial court stated "I have to look at the fact scenario and connect it with the industry involved and whether the wavier would be against public policy as to that particular activity. I have problems with [alleged sexual molestation involving] a four-year-old and a three-year-10-month-old." This was error. Under *Tunkl, supra,* 60 Cal.2d 92, determining whether a release of liability affects the public interest, and is thus void as a matter of public policy, requires analysis of the transaction giving rise to the contract—*not* the allegedly negligent conduct by the party invoking the release. (*Id.* at p. 99.)[3]

### 4. *An Agreement Exculpating a Child Care Provider from Its Own Negligence Is Void as Against Public Policy*

 Civil Code section 1668 provides, "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." In *Tunkl, supra,* 60 Cal.2d 92, the Supreme Court held, under this statute and the cases interpreting it, an "exculpatory provision may stand only if it does not involve 'the public interest.'" (*Id.* at p. 96.)[4] "Traditionally the law has looked carefully and with some skepticism at those who attempt to contract away their legal liability for the commission of torts. [Citation.] This general policy of the common law found legislative expression early in California's history with the enactment of Civil Code section 1668. . . . [¶] This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law. Less clear was the status of negligent violations of *common law* standards of care. While acknowledging some conflict in the cases, Witkin concludes California now follows the modern view of the Restatement of Contracts—'a contract exempting from liability for *ordinary* negligence is valid where *no public interest* is involved . . . and no statute

---

[3]Although we express no opinion as to the merits of the negligence claims, we sympathize with the trial court's "problems" with characterizing sexual contact between same-age preschoolers as "molestation." However, these concerns are more properly understood as involving issues of duty and breach, which do not affect the validity of the release itself.

[4]"The view that the exculpatory contract is valid only if the public interest is not involved represents the majority holding in the United States." (*Tunkl, supra,* 60 Cal.2d at p. 96, fn. 6.)

expressly prohibits it . . . .' [Citation.] [¶] The converse is also true, however. Under Civil Code section 1668 [a service provider] cannot exempt itself from liability even for ordinary negligence if the service it provides implicates the public interest." (*Gardner v. Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 716 [225 Cal.Rptr. 757] (*Gardner*).)

 The *Tunkl* court enumerated six factors to be considered in determining whether an exculpatory contract involves the public interest within the meaning of this rule: "In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra*, 60 Cal.2d at pp. 98-100, fns. omitted.) Each of the *Tunkl* factors is present in this case.

First, child care services are subject to comprehensive public regulation, as the parties acknowledged in their stipulation. (E.g., California Child Day Care Facilities Act, Health & Saf. Code, § 1596.70 et seq.; Child Care and Development Services Act, Ed. Code, § 8200 et seq.)

Second, without question child care services are of vital importance to the public, and a matter of practical necessity for most working parents in California. (Health & Saf. Code, § 1596.72, subd. (e) ["The Legislature finds . . . [¶] . . . [¶] [t]hat good quality child day care services are an essential

service for working parents."].)[5] According to a highly regarded 2001 study by the California Child Care Resource & Referral Network, 55 percent of children ages 13 and under live in families with two employed parents or an employed single head of household. (Portfolio, at p. 13.)[6] For these 4,068,422 children and their parents, participation in a child care program is not something that can easily be declined if the provider attaches unsatisfactory conditions to the service contract. (See Portfolio at p. 24 ["As housing costs soar, fewer parents can afford to stay home with small children, yet there is only about one slot in a licensed child care setting for every five children with working parents. This lack of licensed care limits parents' options . . . ."].)

In *Gardner, supra,* 180 Cal.App.3d at page 718, we explained "this element of the *Tunkl* test appears to boil down to the following question: Is the service merely an optional item consumers can do without if they don't want to waive their rights to recover for negligence or is it something they need enough so they have little choice if the provider attaches a liability disclaimer?" We then held automobile repair service was a "vital, life-or-death function," based in part on the necessity for Californians to have cars "to get to and from their places of employment." (*Ibid.*) Child care is certainly no less a vital need for the working parents of California.

Third, as the parties stipulated, the YMCA child care program is "accessible to the general public." The YMCA program provides care for any child whose parents wish to avail themselves of the service, subject to "established standards" such as the parents' willingness to pay the fees charged and otherwise cooperate with the YMCA. (See *Tunkl, supra,* 60 Cal.2d at p. 102 [hospital's selectivity in accepting patients "does not negate its public aspect or the public interest in it"].)

Fourth, the essential nature of child care necessarily gives the YMCA "a decisive advantage in bargaining strength" with respect to parents who seek

---

[5]Quality child care, of course, is not only a means of enabling parents to participate in the work force but also can be a fundamental building block for healthy childhood development. (See Health & Saf. Code, § 1596.72, subd. (a) ["The Legislature finds . . . [¶] . . . [t]hat child day care facilities can contribute positively to a child's emotional, cognitive, and educational development."]; see also Portfolio, at p. 10 ["There is mounting evidence that children who attend quality child care programs, where caring, qualified professionals engage children in play and learning activities, have a better chance at academic success than children cared for in environments where quality isn't high. The impact of quality care is particularly pronounced for children from low-income families."].)

[6]We take judicial notice of the facts in the Portfolio pursuant to Evidence Code section 452, subdivision (h). (See also Code Civ. Proc., § 909 [factual determinations on appeal]; see generally *People v. Mar* (2002) 28 Cal.4th 1201, 1215, fn. 1 [124 Cal.Rptr.2d 161, 52 P.3d 95] [customary for appellate court opinions to include citations to published works of legal commentators and scholars].)

to use its services. (See Portfolio, at p. 5 ["Because of the shortage of care everywhere in the state, waiting lists are commonplace; securing a slot in a child care program can seem as tough as getting into an Ivy League school."].) Although the trial court referred to "other sources of child care besides the YMCA," the record is silent as to realistic, affordable alternatives available to Gavin's parents. Moreover, the test is not whether the YMCA is the *only* child care program available, but whether child care is a "practical necessity" provided by a relatively small number of entities. (*Gardner, supra,* 180 Cal.App.3d at p. 719 [entity "indisputably 'possesses a decisive advantage of bargaining strength against' [the plaintiff] or almost 'any member of the public who seeks [its] services' " if the defendant is "one of a relatively small number of entities dispensing a service which is a 'practical necessity' to a large number of consumers."].) This is inarguably the case for child care services. In fact, there is a severe shortage of child care spaces in California, and particularly in Los Angeles County: As of 2001, the supply of licensed child care[7] met only 16 percent of the estimated need for licensed care for children in Los Angeles County. (Portfolio, at p. 35.) Put another way, there are more than six times more children up to age 13 with working parents than licensed child care spaces available. (*Ibid.*)

Relying on *Coon v. Nicola* (1993) 17 Cal.App.4th 1225 [21 Cal.Rptr.2d 846], the YMCA argues that, to invalidate its release, Gavin's parents must show they lacked "any realistic opportunity to look elsewhere," and that the YMCA was the *only* child care center available to them. However, *Coon* dealt with the enforceability of agreements to arbitrate—not exculpatory contracts such as the release in this case. The agreement in that case "does not limit appellant's liability in any way but merely provides for a different forum in which to settle disputes." (*Id.* at p. 1237.) Where, as here, the agreement extinguishes any liability on the part of the defendant, we do not require such a strong showing of inequality in bargaining power in order to find the fourth *Tunkl* factor.

Even if the record contained evidence that, despite the scarcity of child care services in Los Angeles County, the YMCA does not actually enjoy a bargaining advantage over potential clients, this fact would not be dispositive. ▪ To fall within the category of agreements affecting the public interest, "the agreement need only fulfill some of the characteristics above outlined" by the *Tunkl* court. (*Tunkl, supra,* 60 Cal.2d at p. 101.) Normally inequality in bargaining positions will be present whenever the services

---

[7]"Licensed child care" includes both child care centers and family child care homes. There is relatively little care for children below school age in license-exempt group care settings. (Hirshberg, Child Care Demand and Supply Under CalWORKS: The Early Impacts of Welfare Reform for California's Children, 1998-2000 (PACE 2002) at p. 23.)

offered are necessary and in short supply. Nonetheless, the cases cited in *Tunkl* established that an exculpatory provision is void as against public policy when it *either* concerns a matter of great importance to the public *or* is the result of unequal bargaining power. (See, e.g., *Bisso v. Inland Waterways Corp.* (1955) 349 U.S. 85, 91 [75 S.Ct. 629, 632-633, 99 L.Ed. 911] [rule against permitting common carriers, bailors, employees and public service companies to contract away liability for negligence has two reasons: "(1) to discourage negligence by making wrongdoers pay damages, *and* (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." (Italics added.)]; *Hiroshima v. Bank of Italy* (1926) 78 Cal.App. 362, 377 [248 P. 947] [holding waiver of liability on stop-payment order invalid as against public policy because bank was required by statute to stop payment whether or not depositor signed release, and "*It may also be added* that the testimony shows the parties in this case were not contracting upon an equal basis"]; *Inglis v. Garland* (1936) 19 Cal.App.2d Supp. 767, 773-774 [64 P.2d 501] [distinguishing case from "contracts by which common carriers sought to exculpate themselves from negligence in respect to duties imposed by law, *or* where the parties had not been free to contract upon an equal footing . . . ." (Italics added.)].)

 Fifth, the parties stipulated that "[t]he YMCA *requires* a release and waiver of liability and indemnity agreement which contains the same contractual language to be signed by the parents of *all* participants in its child care program." (Italics added.) We construe this stipulation as establishing the release was offered on a take-it-or-leave-it basis.[8]

Finally, the parties stipulated Gavin's parents left him in the care of the YMCA and its agents. Indeed, the very nature of child care involves parents placing their child under the control of the child care provider, subject to the risk of negligence by the provider and its employees.

Like the relationship between a hospital and its patients, the relationship between a child care provider and the families who use and depend upon its services has all the characteristics of a contract affecting the public interest, as set forth in *Tunkl*. Indeed, in enacting the California Child Day Care Facilities Act nearly 20 years ago, providing a comprehensive licensing

---

[8]As in *Gardner, supra,* 180 Cal.App.3d 713, "[W]e cannot be 100 percent certain [the releasee] failed to offer [the releasors] the opportunity 'to pay additional fees and obtain protection against negligence.' " (*Id.* at p. 719, fn. 6.) In *Gardner,* the appellant automobile repair service made no claim it offered such an opportunity, and we held "In the absence of evidence—or even any allegations—on this issue and especially in a judgment roll appeal, we have no reason to assume the facts are favorable to appellant." (*Ibid.*) Similarly, in this case the YMCA makes no claim it offered any opportunity to negotiate, and the language of the stipulation plainly suggests otherwise.

system "to ensure a quality day care environment," the Legislature specifically found that "good quality child day care services are an essential service for working parents" (Health & Saf. Code, § 1596.72, subds. (b), (e)) and further declared that "affordable, quality licensed child care is critical to the well-being of parents and children in this state." (Health & Saf. Code, § 1596.73, subd. (e).) Accordingly, the release by which the YMCA attempted to exculpate itself from its own negligence is void as against public policy.

In urging a contrary result, the YMCA relies on three cases in which its release survived challenges pursuant to *Tunkl*. However, those cases involved recreational activities, not the YMCA's child care program. In *YMCA of Metropolitan Los Angeles v. Superior Court, supra*, 55 Cal.App.4th 22, the plaintiff was injured while participating in the YMCA's senior program. The trial court invalidated the release. (*Id.* at p. 25.) The Court of Appeal reversed, holding "The release exhibited none of the coercive aspects typically found in an adhesion contract. The program's simple *recreational* offerings of games, socializing, shopping, and eating lunch, were not so essential as to rob plaintiff of her free will in deciding whether to sign the release. Reasonable minds must agree plaintiff was not precluded by signing the release from finding another senior center or club more to her liking had she wished to do so." (*Id.* at pp. 27-28, italics added.) Similarly, in *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158 [21 Cal.Rptr.2d 245], the plaintiff was injured when she slipped on wet poolside tile after a YMCA swimming class. (*Id.* at p. 160.) The court enforced the release, holding no public policy was involved because "Swimming, like other athletic or recreational activities, however enjoyable or beneficial, is not 'essential' . . . ." (*Id.* at p. 162.) Finally, in *Madison v. Superior Court* (1988) 203 Cal.App.3d 589 [250 Cal.Rptr. 299], the plaintiff was injured while participating in a scuba training course provided by the YMCA. The court held that plaintiff "certainly had the option of not taking the class. There was no practical necessity that he do so." (*Id.* at p. 599.) Child care, by contrast, is an essential activity for working families, not a recreational activity.

The YMCA also argues its release benefits the public by allowing the YMCA to provide low-cost child care. It relies in this regard on *YMCA of Metropolitan Los Angeles v. Superior Court, supra,* 55 Cal.App.4th 22, in which the court observed "low-cost meal programs would be endangered were we to prohibit providers such as the YMCA from shifting the risk of premises liability to their participants. If we were to invalidate the release form, the YMCA's rational response would be to terminate the Senior Program or increase the admission price to reflect its true cost." (*Id.* at p. 28.)

We are, of course, mindful that a child care provider who must bear the cost of its own negligence or insure against that risk may charge a slightly higher fee than one who can shift that cost to its clients. Imposing that cost on the child care provider, however, is fully consistent with the principle of assigning tort liability to the party who is in the best position to distribute losses over a group that should reasonably bear them. (See, e.g., *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 775, fn. 20 [91 Cal.Rptr. 745, 478 P.2d 465]; see generally Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts* (1961) 70 Yale L.J. 499.)

To permit a child care provider to contract away its duty to exercise ordinary care is, in any event, antithetical to the very nature of child care services. "While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, the above circumstances pose a different situation. In this situation the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one which each member of the public, presently, or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of compulsory assumption of the risk of another's negligence. The public policy of this state has been, in substance, to posit the risk of negligence upon the actor; in instances in which this policy has been abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." (*Tunkl, supra,* 60 Cal.2d at p. 101.) Because we believe child care should live up to its name, we hold that exculpatory agreements that purport to relieve child care providers of liability for their own negligence are void as against public policy.

DISPOSITION

The judgment of the trial court is reversed as to the fourth, fifth, sixth and eighth causes of action. The matter is remanded to the trial court for further proceedings not inconsistent with this opinion. Appellants are to recover their costs on appeal.

Johnson, J., and Woods, J., concurred.