[No. C041197. Third Dist. Nov. 12, 2003.]

HEALTH NET OF CALIFORNIA, INC., Plaintiff and Appellant, v. DEPARTMENT OF HEALTH SERVICES et al., Defendants and Respondents.

COUNSEL

Pillsbury Winthrop, Greg L. Johnson, John S. Poulos and Christopher R. Rodriguez for Plaintiff and Appellant.

Bill Lockyer, Attorney General, James M. Humes, Assistant Attorney General, Thomas R. Yanger and Barbara Haukedalen, Deputy Attorneys General, for Defendants and Respondents.

OPINION

**KOLKEY, J.**—Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud . . . or violation of law, whether willful or negligent, are against the policy of the law."[1]

In this case, we are called upon to resolve whether section 1668 invalidates a contractual clause that prohibits any recovery of damages (but not equitable

---

[1] Unless otherwise designated, all further statutory references are to the Civil Code.

relief) for any violation of statutory or regulatory law not made part of the parties' contractual obligations. Based on the clear intent of section 1668, as expressed in its plain language, and consistent with the case law, we find that section 1668 prevents a party from imposing such a contractual prohibition against the recovery of damages for any future violations of statutory or regulatory law.

Plaintiff Health Net of California, Inc. (Health Net) contracted with the California Department of Health Services (DHS) to be one of two health plans providing managed care services to Medi-Cal patients in Tulare County. But in violation of Welfare and Institutions Code section 14087.305, subdivision (j), and its implementing regulations, DHS assigned all "default enrollees"—that is, those who failed to select a plan—to the competing health plan, Blue Cross of California (Blue Cross) over a two-month period. Although the trial court issued a writ of mandate directing DHS to redistribute future default enrollees, it denied damages for the violation based on a provision in Health Net's contract (added at DHS's insistence) which prohibited the recovery of damages as a remedy for any violation of law not expressly incorporated into the contract. Health Net appeals.

■ While courts have often observed that the application of section 1668 is not as broad as its language suggests, they have nonetheless held that under the statute, "a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law." (*Gardner v. Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 716 [225 Cal.Rptr. 757].) We see no reason why this settled interpretation of section 1668 should not be extended to cover *regulatory* violations in light of the fact that regulations, by definition, merely "implement, interpret, or make specific" statutory law (Gov. Code, § 11342.600) and given that the language of section 1668 is not limited to statutory violations but more broadly refers to any "violation of law." It also makes no difference that the contractual clause here bars only the recovery of damages, and not equitable relief, because section 1668 can apply to a limitation on liability (*Klein v. Asgrow Seed Co.* (1966) 246 Cal.App.2d 87, 99–101 [54 Cal.Rptr. 609] (*Klein*)), at least where the limitation rises to the level of an "exempt[ion] . . . from responsibility for [a] . . . violation of law" in the words of section 1668. An unqualified prohibition against the recovery of damages in the context of a commercial transaction certainly qualifies as such an exemption.

Since the exculpatory provision imposed by DHS on Health Net is unenforceable as against public policy under section 1668, we shall reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Two-Plan Model

The Medi-Cal program, which is California's version of the federal Medicaid program, offers managed care, using, among other things, what is known as the "Two-Plan Model." Under the Two-Plan Model, in regions designated by DHS, health services are provided to Medi-Cal beneficiaries through no more than two prepaid health plans: a commercial plan and a local initiative. (Cal. Code Regs., tit. 22, §§ 53800, subd. (a), 53810, subd. (*ll*).)

The commercial plan is a prepaid health plan, which DHS awards through a competitive bidding process. (Cal. Code Regs., tit. 22, §§ 53800, subd. (b)(1), 53810, subd. (g).) The local initiative is likewise a prepaid health plan, but it is organized or designated by a county government, to which DHS awards a contract. (*Id.*, §§ 53800, subd. (b)(2), 53810, subd. (v).)

DHS designated Tulare County as one of the regions subject to the Two-Plan Model. Health Net operates the commercial plan in Tulare County pursuant to an agreement with DHS called the "Standard Agreement."[2] Blue Cross was designated to operate the local initiative.

### II. The Contractual Provision At Issue

In 1997, DHS began proposing amendments to the Standard Agreement. The parties eventually agreed to seven amendments. Although Health Net strenuously objected to the last amendment—Amendment A07—it ultimately and reluctantly signed the amendment in 1998 because DHS insisted that Health Net sign as a condition of receiving a legally required retroactive rate increase.

Amendment A07 revised Section 3.1 of the Standard Agreement (hereinafter Section 3.1)—the contractual clause at issue here.

Section 3.1, headed "Interpretation of Contract," provides in its revised form as follows: "If it is necessary to interpret this Contract, all applicable laws may be used as aids in interpreting the Contract. However, the parties agree that any such applicable laws shall not be interpreted to create

---

[2] DHS has moved to strike the portion of the appendix that contains the original Standard Agreement, arguing that there is insufficient evidence that this document was presented to the trial court. In opposition to the motion, Health Net cites references in the record that show that the Standard Agreement was presented to the trial court. Accordingly, DHS's motion to strike is denied.

contractual obligations upon DHS or Contractor [(Health Net)], unless such applicable laws are expressly incorporated into this Contract in some section other than this Section 3.1, Interpretation of Contract. Except for Section 3.19, Sanctions and Section 3.20, Liquidated Damages Provision, *the parties agree that any remedies for DHS'[s] or Contractor's non-compliance with laws not expressly incorporated into this Contract, or any covenants implied to be part of this Contract, shall not include money damages, but may include equitable remedies such as injunctive relief or specific performance.* In the event any provision of this Contract is held invalid by a court, the remainder of this Contract shall not be affected. This Contract is the product of mutual negotiation, and if any ambiguities should arise in the interpretation of this Contract, both parties shall be deemed authors of this Contract." (Italics added.)

Amendment A07 also deleted former Section 3.2 of the Standard Agreement.[3] The pertinent effect of this deletion was to eliminate any reference in the agreement to the sections of the Welfare and Institutions Code regarding the Two-Plan Model (Welf. & Inst. Code, § 14087.305) and the related regulations promulgated by DHS (Cal. Code Regs., tit. 22, §§ 50185.5, 53800 et seq.), which the trial court found DHS had violated here. And as a result, Section 3.1 operated to prohibit the recovery of damages for DHS's violation of these statutory and regulatory provisions because that section bars the recovery of damages for the failure to comply with any laws *not expressly incorporated* into the contract.

### III. Background Underlying Health Net's Suit

Health Net began operating in January 1999 in Tulare County. Blue Cross started a month or two later.

Under the Two-Plan Model, eligible individuals had 30 days to choose (in writing) among the available prepaid health plans in the region. (Welf. & Inst. Code, § 14087.305, subd. (c).) A person who failed to make the choice was assigned to, and enrolled in, an appropriate prepaid health plan. (*Id.,* § 14087.305, subd. (e).) DHS informed Health Net and Blue Cross that these "default enrollees" were to be assigned to Health Net until Blue Cross began operations, and then to Blue Cross until a minimum enrollment was reached, which DHS set at 30,000.

However, in making those assignments, Welfare and Institutions Code section 14087.305, subdivision (j), required that "[t]o the extent possible, the

---

[3] Former Section 3.2 of the agreement provided: "This Contract will be governed and construed in accordance with Chapter 7 and 8 (commencing with Section 14000), Part 3, Division 9, W[elfare and] I[nstitutions] Code; Division 3, Title 22, C[alifornia] C[ode of] R[egulations] . . . ."

arrangements for carrying out [default enrollments] shall provide for the equitable distribution of Medi-Cal beneficiaries among participating prepaid health plans, or managed care plans."

And while that section did not define "equitable distribution," DHS adopted a regulation that required default enrollees to be assigned to the local initiative until it reached its enrollment minimum, and thereafter required assignments to be "evenly distributed between the local initiative and the commercial plan" until the latter reached its enrollment maximum, at which time further assignments to the commercial plan would be discontinued. (Cal. Code Regs., tit. 22, § 50185.5, subd. (g)(8).) The regulations also provided for the calculation of the enrollment minimum for the local initiative (*id.*, § 50185.5, subd. (b)(12)) and the enrollment maximum for the commercial plan (*id.*, § 53820, subd. (b)). DHS set the maximum enrollment for Health Net at 42,000.

## IV.  Health Net's Suit

In May 1999, Health Net filed an action against DHS for injunctive relief, breach of contract, and mandamus. Health Net alleged that as a result of DHS's enrollment practices, Health Net had not received any default enrollees in Tulare County in April and May 1999, whereas Blue Cross had received 11,071, in violation of Welfare and Institutions Code section 14087.305, subdivision (j). Health Net sought and obtained a temporary restraining order prohibiting DHS from assigning any further default enrollees to Blue Cross.

After briefing and a hearing, the trial court found that DHS had applied an invalid enrollment minimum of 30,000 for the local initiative, which calculation was based on a 1993 article in a medical journal, rather than the formula prescribed by the regulations. The trial court therefore issued a writ of mandamus compelling DHS to recalculate the local initiative's minimum enrollment and the commercial plan's maximum enrollment in accordance with the applicable regulations. The writ also required that if the recalculated enrollment minimum for the local initiative indicated that DHS had assigned an excessive number of default enrollees to Blue Cross, "then DHS [should] assign all presently unassigned default enrollees and all future default enrollees to the Health Net CP [(commercial plan)] until such time as the distribution of default enrollees between the LI [(local initiative)] and the CP matches the distribution which would have existed had DHS applied the correct LI [enrollment] minimum in the first place." The court also issued a permanent injunction to a similar effect.

But the trial court did not grant any damages sustained from the loss of enrollees prior to the redistribution. Indeed, the trial court denied, without

further explanation, Health Net's request for an evidentiary hearing as to damages pursuant to Code of Civil Procedure section 1095.[4] Still, the court specifically noted that its decision did "not pertain to Health Net's cause of action for breach of contract against DHS."[5]

In compliance with the writ, DHS recalculated the minimum enrollment level for the local initiative and determined it to be 13,872. DHS then informed Health Net that Blue Cross had received 7,114 default enrollments after attaining this level and that therefore Health Net was entitled to one-half of the defaults, or 3,557. (Cal. Code Regs., tit. 22, § 50185.5, subd. (g)(8).)

Thereafter, Health Net and DHS filed cross-motions for summary adjudication and summary judgment, respectively, addressing Health Net's right to damages. Health Net sought summary adjudication against DHS for: (1) its right to damages under Code of Civil Procedure section 1095; (2) its claim for breach of contract based on DHS's statutory and regulatory violations concerning the allocation of default enrollees between Health Net and Blue Cross; and (3) its claim for breach of contract based on DHS's violation of the applicable regulation regarding default assignments when Health Net was operating but Blue Cross was not. In its reply brief, Health Net limited its summary adjudication motion to its entitlement to damages and a finding that Section 3.1 of the agreement was unenforceable pursuant to section 1668 and otherwise.

DHS, in turn, moved for summary judgment, asserting that Section 3.1 was valid and precluded an award of damages on any of Health Net's claims.

Observing that the parties had made cross-motions for summary disposition "of the issue of Health Net's entitlement to damages," the trial court denied Health Net's motion and granted DHS's. The court took as undisputed, for purposes of the motions, Health Net's claims of financial losses resulting

---

[4] Code of Civil Procedure section 1095 provides in relevant part that in a mandamus action, "[i]f judgment be given for the applicant, the applicant may recover damages which the applicant has sustained, as found by the jury, or as may be determined by the court or referee . . . ."

[5] The trial court also declined to grant any separate relief with respect to DHS's asserted failure to assign default enrollments to Health Net during the period when Health Net was, but Blue Cross was not, operating in Tulare County. California Code of Regulations, title 22, section 50185.5, subdivision (g)(5), provides that if the commercial plan is operational and the local initiative is not, all assignments will be directed to the commercial plan. But Health Net did not seek relief in its original complaint for this period and first raised the issue on mandamus in its reply brief. Health Net subsequently amended its complaint to state separate mandamus and breach of contract claims for this period. But after allowing the amended complaint to be filed, the trial court denied the relief, finding no violation of the regulation, because no default assignments were made, or were required to be made, during the period.

from DHS's violation of its regulations concerning the assignment of default enrollees (i.e., the lost profits that would have been generated from the default enrollees had DHS timely assigned them to Health Net). And the court reasoned that "Health Net may maintain a claim for damages unless such a claim is excluded by contract." But the court then found that Section 3.1 "is enforceable as written and thus bars Health Net's claims for monetary damages." Accordingly, the court ruled against Health Net and in favor of DHS.[6]

Judgment was entered in favor of DHS, from which Health Net appeals.

## DISCUSSION

### I. Standard of Review

On appeal, we review the record independently to determine whether summary judgment was appropriate. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Additionally, the issue of whether a contractual provision is contrary to public policy, or a statute which embodies such public policy, is a question of law that we may independently determine. (E.g., *Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 838 [247 Cal.Rptr. 340].)

### II. Section 1668 Invalidates the Exculpatory Clause Here

Health Net contends that "under section 1668 . . . , [S]ection 3.1 is invalid to the extent that it purports to exculpate DHS from any liability for monetary damages caused by statutory violations, even if unintentional."

Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

---

[6] The court also denied Health Net's claims regarding the short period when Health Net was, and Blue Cross was not, operating in Tulare County, based on the court's prior ruling that DHS did not violate the regulation applicable to such circumstances. (Cal. Code Regs., tit. 22, § 50185.5, subd. (g)(5); see fn. 5, *ante.*) While Health Net continues to contend that it presented evidence of lost premiums during this period, it does not specifically contend on appeal that the trial court's decision on this claim was in error. Since Health Net has not developed such an argument, we need not consider it. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 [241 Cal.Rptr. 67, 743 P.2d 1323].) And " '[t]he statutory language, of course, is the best indicator of legislative intent.' [Citation.]" (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 350 [19 Cal.Rptr.2d 882, 852 P.2d 377].) Further, in construing the words of a statute, we "giv[e] to the language its usual, ordinary import and accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at pp. 1386–1387.)

Based on these canons of statutory construction, we cannot construe section 1668 to invalidate all contracts that seek to exempt a party from responsibility for *any* violation of law, including any common law or contractual violation; otherwise, there would be no need for the statute to separately identify fraud or willful injury, in addition to any "violation of law," as prohibited objects of an exculpation. Further, "[d]espite its purported application to '[a]ll contracts,' section 1668 does not bar either contractual indemnity or insurance, notwithstanding that (aside from semantics) the practical effect of both is an 'exempt[ion]' from liability for negligence." (*Farnham v. Superior Court* (1997) 60 Cal.App.4th 69, 74 [70 Cal.Rptr.2d 85] (*Farnham*) ["Section 1668 is not strictly applied"].) Accordingly, "[d]espite its broad language, section 1668 does not apply to every contract" or *every* violation of law. (See *Vilner v. Crocker National Bank* (1979) 89 Cal.App.3d 732, 735 [152 Cal.Rptr. 850]; *Farnham, supra,* 60 Cal.App.4th at p. 74.)

In *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 95–96 [32 Cal.Rptr. 33, 383 P.2d 441] (*Tunkl*), the California Supreme Court observed that "the courts' interpretations of [section 1668] have been diverse. . . . The recent case of *Mills v. Ruppert* (1959) 167 Cal.App.2d 58, 62–63 [333 P.2d 818] . . . apparently limits '[n]egligent . . . violation of law' exclusively to statutory law. [Fn. omitted.] Other cases hold that the statute prohibits the exculpation of gross negligence only; [fn. omitted] still another case states that the section forbids exemption from active as contrasted with passive negligence. [Fn. omitted.]"

Our state Supreme Court concluded in *Tunkl,* however, that "[i]n one respect . . . , the decisions are uniform. The cases have consistently held that the exculpatory provision may stand only if it does not involve 'the public interest.' [Fn. omitted.]" (*Tunkl, supra,* 60 Cal.2d at p. 96.) Finding that a contract between a hospital and an entering patient affects the public interest, the state high court thereupon invalidated a clause in a hospital admission

form that released the hospital from liability for any negligence of its employees. (*Tunkl*, at pp. 94, 101.)

As summarized by Witkin, "The present view is that a contract exempting from liability for ordinary negligence is valid where no public interest is involved . . . and no statute expressly prohibits it [citation]. [Citations.] Limitation of liability provisions are valid in similar circumstances. [Citations.] [¶] But there can be no exemption from liability for intentional wrong, gross negligence, or *violation of law*." (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 631, p. 569, italics added.)

It is now settled—and in full accord with the language of the statute—that notwithstanding its different treatment of ordinary negligence, under section 1668, "a party [cannot] contract away liability for his fraudulent or intentional acts or for his negligent violations of *statutory* law," regardless of whether the public interest is affected. (*Gardner v. Downtown Porsche Audi, supra*, 180 Cal.App.3d at p. 716; accord, *Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471–1472 [266 Cal.Rptr. 593] [same]; *Nunes Turfgrass, Inc. v. Vaughan-Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1538 [246 Cal.Rptr. 823] (*Nunes Turfgrass*) [same]; *Mills v. Ruppert, supra*, 167 Cal.App.2d at pp. 62–63; see *Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662, 670–671 [131 Cal.Rptr.2d 168] [same]; *Werner v. Knoll* (1948) 89 Cal.App.2d 474, 475–476 [201 P.2d 45].)

A law review comment on the *Tunkl* case also reads the plain text of section 1668 to prohibit unqualifiedly exculpatory provisions that exempt responsibility for any statutory violations: "The section would seem to bar contractual exculpation only for fraud, willfully-inflicted injuries, and the willful or negligent violation of a statute." (Comment, *Contractual Exculpation from Tort Liability in California—The "True Rule" Steps Forward* (1964) 52 Cal. L.Rev. 350, 357 (hereinafter *Contractual Exculpation*).)[7]

The statute's prohibition against contractual provisions that exculpate violations of statutory law has also been construed to include regulatory violations. (E.g., *Halliday v. Greene* (1966) 244 Cal.App.2d 482, 488 [53 Cal.Rptr. 267] [general industry safety order requiring two escape exits from work area]; see *Delta Air Lines, Inc. v. Douglas Aircraft Co.* (1965) 238

---

[7] The comment noted, however, "[t]here has also been some seemingly unwarranted confusion over the place and meaning of 'violation of law' and 'negligent' in the section. Limitation of 'violation of law' to statutory law has been termed a 'debatable' interpretation, 1 Witkin, Summary of California Law 228 (7th ed. 1960), but the only alternative reading would create a *complete denial of exculpation from liability for tortious conduct, i.e.*, violations of nonstatutory law, which is implicitly rejected by all of the cases." (*Contractual Exculpation, supra*, 52 Cal. L.Rev. at p. 357, fn. 60.)

Cal.App.2d 95, 105–106 [47 Cal.Rptr. 518] [FAA regulations].) This makes sense since regulations, by definition, are rules, orders, and standards of general application that "implement, interpret, or make specific" the statutory law. (Gov. Code, § 11342.600; *Sherwin-Williams Co. v. South Coast Air Quality Management Dist.* (2001) 86 Cal.App.4th 1258, 1283 [104 Cal.Rptr.2d 288].) There is no principled basis upon which to distinguish a violation of statute from a violation of a regulation that implements the statute in the context of prohibited exculpatory provisions.

Accordingly, despite differences in the interpretation of the scope of section 1668, California courts have construed the statute for more than 85 years to at least invalidate contract clauses that relieve a party from responsibility for future statutory and regulatory violations. (See, e.g., *Union Constr. Co. v. Western Union Tel. Co.* (1912) 163 Cal. 298, 314–315 [125 P. 242] [statute requiring telegraph company to use great care and diligence in the transmission and delivery of messages]; *In re Marriage of Fell* (1997) 55 Cal.App.4th 1058, 1064–1065 [64 Cal.Rptr.2d 522] [statute requiring financial disclosures prior to marital settlement agreement]; *Halliday v. Greene, supra,* 244 Cal.App.2d at p. 488 [general industry safety order requiring two escape exits from work area]; *Hanna v. Lederman* (1963) 223 Cal.App.2d 786, 792 [36 Cal.Rptr. 150] [municipal code section specifying sprinkler system alarm requirements]; see *Delta Air Lines, Inc. v. Douglas Aircraft Co., supra,* 238 Cal.App.2d at pp. 105–106 [FAA regulation].)

In this instance, DHS has invoked Section 3.1 of the agreement to exculpate it from liability for damages to Health Net for the violation of statutory law (Welf. & Inst. Code, § 14087.305, subd. (j)), as defined by its implementing regulations (Cal. Code Regs., tit. 22, §§ 50185.5, subds. (b)(12), (g)(8), 53820). Such an exculpatory clause violates section 1668.

The trial court had reasoned to the contrary that section 1668 was not violated because the exculpatory clause was not part of a transaction that affected the public interest within the meaning of the Supreme Court's decision in *Tunkl.* ■ But as shown, section 1668 prohibits the enforcement of any contractual clause that seeks to exempt a party from liability for violations of statutory and regulatory law, regardless of whether the public interest is affected.

Accordingly, assuming that but for the exculpatory clause in Section 3.1, DHS would be otherwise liable for damages for the violation of law here—an issue we have not been asked to decide—the exculpatory clause here cannot serve to bar the recovery of damages and is unenforceable.

### III. Alternatively, Section 1668 Invalidates the Exculpatory Clause Because the Public Interest *Is* Affected

Alternatively, even if section 1668 is more narrowly interpreted to invalidate exculpatory clauses only where the public interest is affected, the exculpatory clause here cannot stand.

As noted earlier, in *Tunkl,* the California Supreme Court ruled that an exculpatory provision "may stand only if it does not involve 'the public interest' " (*Tunkl, supra,* 60 Cal.2d at p. 96, fn. omitted)—although it did not suggest that an exculpatory clause that did *not* affect the public interest was necessarily enforceable (*ibid*). The exculpatory clause here does affect the public interest and thus cannot stand under *Tunkl.*

Addressing the concept of public interest, the high court in *Tunkl* observed: "No definition of the concept of public interest can be contained within the four corners of a formula. The concept, always the subject of great debate, has ranged over the whole course of the common law; rather than attempt to prescribe its nature, we can only designate the situations in which it has been applied." (*Tunkl, supra,* 60 Cal.2d at p. 98.)

The *Tunkl* high court then sought to specify the characteristics of the type of transaction that was affected with a public interest such that an associated exculpatory clause would be held invalid: "In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. [Fn. omitted.] The party seeking exculpation is engaged in performing a service of great importance to the public, [fn. omitted] which is often a matter of practical necessity for some members of the public. [Fn. omitted.] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [Fn. omitted.] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [Fn. omitted.] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, [fn. omitted] and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [Fn. omitted.] Finally, as a result of the transaction, the person or property of the purchaser is placed under the

control of the seller, [fn. omitted] subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra,* 60 Cal.2d at pp. 98–101.)

■ Based on the foregoing discussion in *Tunkl,* we have no hesitation in concluding that an exculpatory clause that is part of a transaction that provides managed health care for Medi-Cal beneficiaries affects the public interest because such an exculpation deters, and makes more expensive, commercial plans' participation in such public-interest services.

Directing our attention to the first *Tunkl* factor, the exculpation clause here is part of a transaction that concerns a business—prepaid health services for Medi-Cal recipients—which is not only "thought suitable for public regulation" (*Tunkl, supra,* 60 Cal.2d at p. 98), but which is regulated.

Second, DHS—the party seeking exculpation—is "engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public." (*Tunkl, supra,* 60 Cal.2d at pp. 98–99, fns. omitted.) After all, the Legislature has specified that "[t]he means employed [in providing health care for those without sufficient resources should] allow, to the extent practicable, eligible persons to secure health care in the same manner employed by the public generally," such as "access to health care through enrollment in organized, managed care plans of the type available to the general public." (Welf. & Inst. Code, § 14000 & subds. (a), (c).) DHS's award to commercial prepaid health plans, and its regulation of that arrangement, is a service of great importance to, and of practical necessity for, needy members of the public. Even the equitable distribution of default enrollees between the commercial plan and the local initiative in the Two-Plan Model—the specific statutory and regulatory matter at issue here—serves the public interest by encouraging participation by commercial plans in the Two-Plan Model. It follows that the exculpation of responsibility for compliance with this statutory and regulatory scheme affects the public interest.

The third *Tunkl* factor—that the party seeking exculpation holds itself out as willing to perform the service for qualified members of the public (*Tunkl, supra,* 60 Cal.2d at p. 99)—may not literally apply here because DHS seeks exculpation in its transaction with health care providers, not with the public directly. But the transaction in which the exculpatory clause appears does provide a service to members of the public by making prepaid health plans available to Medi-Cal beneficiaries.

In any event, not all of the *Tunkl* factors need be satisfied in order for an exculpatory clause to be deemed to affect the public interest. The Supreme Court in *Tunkl* conceded that "[n]o definition of the concept of public interest

can be contained within the four corners of a formula" and stated that the transaction must only "exhibit some or all" of the identified characteristics. (*Tunkl, supra,* 60 Cal.2d at p. 98; accord, *Gardner v. Downtown Porsche Audi, supra,* 180 Cal.App.3d at p. 717.) Thus, the ultimate test is whether the exculpatory clause affects the public interest, not whether all of the characteristics that help reach that conclusion are satisfied.

Turning to the fourth *Tunkl* factor, DHS has a "decisive advantage of bargaining strength" against the commercial plans, which, after all, are supplicants in pursuit of DHS's award of a contract. (*Tunkl, supra,* 60 Cal.2d at p. 100.)

Fifth, although DHS may not have confronted Health Net with a standardized adhesion contract that made no provision for Health Net to purchase additional protection, as specified in *Tunkl, supra,* 60 Cal.2d at page 100, DHS did exercise its superior bargaining power by forcing upon Health Net an amendment to which Health Net objected and upon which DHS insisted, thereby satisfying the purpose underlying the fifth factor.

Finally, with respect to the final *Tunkl* factor, as a result of the transaction here, Health Net's investment was subject to the risk of carelessness by DHS in the administration of its regulations concerning an equitable assignment of default enrollees (*Tunkl, supra,* 60 Cal.2d at p. 101).

Accordingly, an exculpatory clause that seeks to absolve DHS from liability for damages from any future statutory or regulatory violations of law does affect the public interest within the meaning of *Tunkl* because it deters, and makes more expensive, participation in a transaction which serves the public interest, which transaction is subject to public regulation, and which performs a service of "practical necessity for some members of the public" (*Tunkl, supra,* 60 Cal.2d at p. 99): managed care for Medi-Cal beneficiaries.

That the transaction here involves the public interest is further demonstrated by the fact that even escrow contracts (*Akin v. Business Title Corp.* (1968) 264 Cal.App.2d 153 [70 Cal.Rptr. 287]), contracts for childcare services (*Gavin W. v. YMCA of Metropolitan Los Angeles, supra,* 106 Cal.App.4th 662), and automobile repair contracts (*Gardner v. Downtown Porsche Audi, supra,* 180 Cal.App.3d at p. 720) have been deemed to involve the public interest for purposes of section 1668.

██ Moreover, the fact that DHS is a public agency does not alter the application of section 1668 in invalidating the exculpatory clause here. Since the scope of a public entity's liability for injury is governed by statute (*Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 630–631

[76 Cal.Rptr.2d 489, 957 P.2d 1323]), a public entity has no right to expand its immunity from liability through contract in a manner that the Legislature has forbid (pursuant to section 1668 or otherwise).

Accordingly, DHS's exculpatory clause affects the public interest and therefore violates section 1668.

## IV. A Limitation On Liability Can Violate Section 1668

Notwithstanding the broad language of section 1668, DHS argues that the exculpatory provision in Section 3.1 is not invalid under section 1668 because the clause is akin to a limitation on liability and is not a complete exemption. It notes that Section 3.1 only excludes money damage remedies, not equitable relief.

But DHS cites no authority for its position.

Further, section 1668 has, in fact, been applied to invalidate provisions that merely limit liability. (See *Klein, supra,* 246 Cal.App.2d 87, 100–101; cf. *Pink Dot, Inc. v. Teleport Communications Group* (2001) 89 Cal.App.4th 407, 413–414 [107 Cal.Rptr.2d 392]; but see *Delta Air Lines, Inc. v. McDonnell Douglas Corp.* (5th Cir. 1974) 503 F.2d 239, 243–244.)

And while some contractual limitations over the scope of available remedies need not necessarily run afoul of section 1668—an issue we need not decide here—there is assuredly a point at which a limitation on the scope of remedies reaches the point of constituting an "exempt[ion] . . . from responsibility for [the] . . . violation of law," in the words of the statute. In a commercial case, an exculpation of any liability for *any* damages for *any* statutory violation surely rises to the level of an "exempt[ion] from responsibility" within the meaning of the plain language of section 1668.

We acknowledge that in *Farnham,* the appellate court said that under section 1668, "[a]lthough exemptions from *all* liability for intentional wrongs, gross negligence and violations of the law have been consistently invalidated [citations], we have not found any case addressing a *limitation* on liability for intentional wrongs, gross negligence or violations of the law." (*Farnham, supra,* 60 Cal.App.4th at p. 74.) The Court of Appeal there held that a " 'sole remedy' " provision in an employment agreement—which allowed an employee to arbitrate employment-related claims against his corporate employer, but required him to waive his right to sue the corporation's shareholders, officers, directors, and employees for damages—was not per se unenforceable under section 1668. (*Farnham, supra,* 60 Cal.App.4th at pp. 71–72, 77.)

But the court in *Farnham* erroneously claimed that no case had invalidated a limitation-on-liability provision under section 1668. In fact, *Klein,* which *Farnham* cited as a case that concerned an *unlimited* exculpatory clause (*Farnham, supra,* 60 Cal.App.4th at p. 74), did involve a limitation on liability.

In *Klein,* cans sold to a seed broker were labeled and warranted as containing seed of a fast-ripening tomato variety, although the manufacturer knew that the seed was, in fact, mixed with "rogues." (*Klein, supra,* 246 Cal.App.2d at p. 91.) However, the fine print on the warranty limited the manufacturer's liability to the purchase price of the seed (*id.* at p. 92), and the manufacturer argued that there was an express agreement and course of dealing that limited its liability to the price of the seed. (*Id.* at pp. 98–99.) We nonetheless concluded that there was no agreement or course of dealing that limited the seed manufacturer's liability to a refund of the purchase price where the mixed seed was knowingly and deliberately sold as pedigreed seed. (*Id.* at p. 99.) We also ruled that had there been such an agreement—based on the fine print on the cans limiting liability to the purchase price—it would have been void under section 1668 (*id.* at p. 100) and concluded: "Civil Code section 1668 makes the statement of limitation of liability void as against public policy." (*Id.* at p. 101.) Thus, *Klein* applied section 1668 to void a limitation-of-liability provision.

*Farnham* is also distinguishable because the exculpatory clause in that case had not deprived the plaintiff of full redress for the past injury (unlike here). In *Farnham,* under the "sole remedy" provision described above, the plaintiff sued the corporate employer for defamation and won a $500,000 arbitration award. (*Farnham, supra,* 60 Cal.App.4th at p. 76.) Although his effort to litigate the identical claim against two individuals, who were shareholders, officers, and directors, was denied under the exculpatory "sole remedy" clause, the *Farnham* court characterized the claim as an effort at "another bite at the defamation apple." (*Id.* at p. 77.) The court therefore suggested that the arbitral award largely compensated the plaintiff for the defamation and concluded: "In our view, . . . a contractual *limitation* on the liability of directors for defamation arising out of their roles as directors is . . . valid where, as here, the injured party retains his right to seek redress from the corporation. [Fn. omitted.]" (*Ibid.*)

In contrast, here, Section 3.1 prohibits Health Net from the recovery of any damages at all for DHS's statutory or regulatory violations and in any other instance where it did not have the foresight or bargaining power to expressly incorporate the statutory provisions into the Standard Agreement. The mandamus and injunctive relief that Health Net obtained operated prospectively only and did not compensate it for any lost revenue from beneficiaries

wrongly assigned to Blue Cross. Unlike the "sole remedy" provision in *Farnham,* by which the plaintiff was largely afforded redress, Section 3.1 contains an exculpatory clause that exempts DHS completely from responsibility for completed wrongs.

Finally, unlike this case, *Farnham* did not address exculpation for statutory and regulatory violations nor involve a transaction affecting the public interest. As we have observed earlier, section 1668 affords some leeway in the enforcement of exculpatory clauses involving common law tort claims arising from transactions not affecting the public interest. Thus, *Farnham's* enforcement of a "sole remedy" clause in the context of a common law tort claim in a transaction not affecting the public interest cannot guide our analysis of an exculpatory clause covering statutory and regulatory violations in a transaction affecting the public interest.

## V. Conclusion

We conclude that Section 3.1 is invalid under section 1668 insofar as it exculpates DHS from liability for any money damages for statutory and regulatory violations. Further, section 1668, as interpreted by the California Supreme Court in *Tunkl, supra,* 60 Cal.2d at page 96, invalidates the exculpatory provision in Section 3.1 because that provision, as part of a transaction that affords a prepaid health plan to Medi-Cal beneficiaries, affects the public interest.

Since the exculpatory provision under Section 3.1 is unenforceable, summary judgment was improperly granted to DHS. We note that we have not been asked to determine whether DHS is immune from liability for damages on any other ground and therefore do not address any such issue. Nor has Health Net asked that we enter summary adjudication in its favor.[8]

## DISPOSITION

The judgment is reversed and the matter remanded to the trial court for further proceedings. Health Net shall recover its costs on appeal. (Cal. Rules of Court, rule 27(a)(1).)

Sims, Acting P. J., and Robie, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 3, 2004.

---

[8] Further, since we have determined that summary judgment should not have been granted and have reversed it because section 1668 invalidates the exculpatory provision in section 3.1, we need not reach Health Net's other contentions concerning the enforceability of the exculpatory provision. (See *Stevens v. Department of Corrections* (2003) 107 Cal.App.4th 285, 293, fn. 3 [132 Cal.Rptr.2d 19].)