Filed 7/19/13  Jones v. City of Ukiah CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ERNEST JONES,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF UKIAH,<br><br>    Defendant and Respondent. | A132004<br><br>(Mendocino County<br>Super. Ct. No. SCUK CVPO 0954878) |

Plaintiff Ernest Jones brought this action against defendant City of Ukiah (City) alleging he was injured in a softball game on a field owned by the City.  The trial court granted the City's motion for summary judgment on the ground that plaintiff was bound by a release he had signed.  The court thereafter entered a judgment of dismissal. Plaintiff contends on appeal that he was not bound by the release because its contractual nature was not clear, and that in any case, the release could not exculpate the City from liability for gross negligence or statutory liability for dangerous condition of public property.  We shall affirm the judgment.

## I.  BACKGROUND

Plaintiff asserted causes of action against the City for general negligence and premises liability, including an allegation that the City owned public property on which a dangerous condition existed.  According to the complaint, City employees so negligently maintained a City softball field and so negligently supervised those maintaining the field as to allow a dangerous condition on the property and cause serious injury to plaintiff. The City moved for summary judgment.

1

Plaintiff, an adult, slid into second base during a softball game in October 2008, and fractured his ankle. He testified that his foot jammed under the base.

Plaintiff had signed a two-sided document. One side of the document stated: "2008 FALL MEN'S SOFTBALL LEAGUE SOFTBALL ROSTER FORM [¶] **ALL PLAYERS MUST SIGN BELOW BEFORE THEY CAN PLAY.**" Immediately below this heading, in smaller typeface, the form stated: "[¶] *A player signing his name on this Softball Roster form acknowledges that they have read and understand all of the provisions of the waiver and release form on the reverse side of this form. [¶] Please contact the Community Services Department for more information: 463-6714."* Below this language were spaces for a roster. The first column said, "PRINT PLAYER'S NAME." The second column said, "PLAYER'S SIGNATURE [¶] *(Read Waiver Before Signing)*." The remaining columns asked for address, phone, and other contact information. Plaintiff was the last of the 12 players to sign the form.

The reverse side of the form stated: "**2008 FALL MEN'S SOFTBALL LEAGUE [¶] SOFTBALL LEAGUE ROSTER & RELEASE OF LIABILITY.**" Under the heading "**HOLD HARMLESS/INDEMNIFICATION FOR ADULT ATHLETIC PARTICIPATION**," the form provided: "In signing my name on this player roster form, I realize that participation in this sport includes the possibility of injury to myself, fellow participants and non-participants. [¶] I agree to indemnify and hold harmless the City of Ukiah and their officials, agents, volunteers, or employees from and against any and all actions, claims, damages, liabilities, or expenses for any personal injury or loss of property, which I may suffer from or be liable for as a result of my participation in this sport whether caused in whole or in part by myself, fellow participants, non-participants. [¶] I understand that the City of Ukiah does not provide Accident Insurance to participants of this activity. [¶] **SOFTBALL PLAYER WAIVER AND RELEASE OF LIABILITY** [¶] *I, the undersigned player acknowledge, agree, and understand that:* [¶] 1. Voluntarily and of my own free will, I elect to participate as a member of the softball team and league indicated on the front of this roster form. [¶] 2. I understand that there are certain risks and hazards involved in

2

playing in softball that may result in injury or death to me or other players, including, but not limited to, those hazards associated with weather conditions, playing conditions, equipment and other participants.  [¶] 3.  I understand that sliding into base is dangerous to me and to other players and may result in serious injury or death.  [¶] 4.  I understand that the very nature of the game of softball is hazardous and risky, including, but not limited to, the acts of pitching, throwing, fielding and catching of the ball, the swinging of the bat, running, jumping, stretching, sliding and diving, and collisions with other players and with stationary objects, all of which can cause serious injury or death to me and to other players.  [¶] *I further understand and agree that in consideration for the right to play as a member of the team designated on this roster from* [sic] *and in consideration for permission to play on the fields arranged for by the team or league:* [¶] 1. I voluntarily elect to accept and assume all risks of injury incurred or suffered by me (a) while practicing or playing as a member of the team so designated, (b) while serving in a non-playing capacity as a team member during practice or play by other teams or by other players on my team, and (c) while on or upon the premises of any and all of the fields arranged for by my team or league for practice of play.  [¶] 2.  I release, discharge and agree not to sue the city of Ukiah, and its officers, volunteers, agents or employees, the team and the league designated below or any field on which softball is practiced or played by my team, or the Amateur Softball Association, employees, or any person or entity connected with the City of Ukiah, team league, field or Amateur Softball Association of America for any claim, damages, costs or cause of action which I have or may in the future have as a result of injuries or damages sustained or incurred by me. [¶] *I, the undersigned player, acknowledge that I have read and that I understand each and every one of the above provisions in this waiver and release form and agree to abide by them.  Do not sign this form unless you have read, understood and agree to its terms.  It contains important terms that could affect your legal rights if you have questions.  Consult an attorney or legal advisor <u>before</u> you sign this document.*"

In a declaration, Miles Hayes, one of the umpires at the game, stated that he had umpired more than 30 games at the City of Ukiah field.  One of his duties was to check

3

the stability of the base pads before the game, after each inning, and after every slide, to ensure the base was not wobbly, unstable, or unsafe in any way.  He was standing between first and second base when plaintiff slid into second base.  Afterward, he inspected second base and the game resumed.  He stated that if the base had been wobbly, unstable, or unsafe in any way, he would not have allowed play to resume.  He had never heard anyone complain about the condition of second base on the Ukiah field, and had never seen any player injured by sliding into second base on that field.

In opposition to the motion for summary judgment, plaintiff submitted his own declaration.  He stated he fractured his left fibula and ruptured the ligaments of his left ankle when his left foot became trapped in a gap between second base and the ground as he slid into it during a game of the Ukiah Men's Softball league on the City of Ukiah's softball field.  According to plaintiff, the gap existed because the base was only partially inserted into the sleeve that secured it to the ground.  For at least two years before his injury, plaintiff had seen that the base did not stay down in its sleeve and that there was usually a gap between the bottom of the base and the ground during league play.  Since his injury, he had spoken with other players who acknowledged the gap had existed for years.  Plaintiff also stated in his declaration that he complained to Hayes about the condition of the second base that caused his injury, although his declaration did not specify when he made that complaint.

Plaintiff stated that when he filled out the roster form, he did not know he was signing any kind of contract or waiver.  He was in a hurry when he signed because he was late and the last to arrive for practice.  He did not see anything called a "Waiver," and did not know anything was written on the back of the form.  When he filled out the form, it was attached to a clipboard, and he did not see the back of the form.  He did not read the italicized text on the roster because "it was hard to see and because it didn't occur to me that the Roster could have any legal effect besides enrolling me in the team."  No one told him that by signing, he was waiving his rights to compensation.  He was not given a copy of either side of the roster.  He thought the $35 fee to play in the softball

4

league paid for medical insurance in case someone was injured during play. He had never knowingly signed a release for the City.

Plaintiff also submitted a declaration of Roy Nugent, who stated he had regularly played softball on the field for two years before plaintiff's injury, and most of the times he saw second base, there was an obvious gap between the bottom of the base and the ground.

## II. DISCUSSION

### A. Standard of Review

"We review a grant of summary judgment de novo. [Citation.] In performing our de novo review, we employ a three-step analysis. 'First, we identify the issues raised by the pleadings. Second, we determine whether the movant established entitlement to summary judgment, that is, whether the movant showed the opponent could not prevail on any theory raised by the pleadings. Third, *if the movant has met its burden*, we consider whether the opposition raised triable issues of fact.' [Citations.] . . . Any evidence we evaluate is viewed in the light most favorable to the plaintiff as the losing party; we strictly scrutinize the defendant's evidence and resolve any evidentiary doubts or ambiguities in the plaintiff's favor." (*Barber v. Chang* (2007) 151 Cal.App.4th 1456, 1462–1463.)

In opposing a motion for summary judgment, plaintiffs " 'may not rely upon the mere allegations or denials of [their] pleadings,' but must 'set forth the specific facts showing that a triable issue of material fact exists.' [Citation.] 'The party opposing the summary judgment must make an independent showing by a proper declaration or by reference to a deposition or another discovery product that there is sufficient proof of the matters alleged to raise a triable question of fact if the moving party's evidence, standing alone, is sufficient to entitle the party to judgment. [Citation.] To avoid summary judgment, admissible evidence presented to the trial court, not merely claims or theories, must reveal a triable, material factual issue. [Citation.] Moreover, the opposition to summary judgment will be deemed insufficient when it is essentially conclusionary,

5

argumentative or based on conjecture and speculation.' [Citation.]" (*Trujillo v. First American Registry, Inc.* (2007) 157 Cal.App.4th 628, 635.)

## B. Effect of Release and Waiver

Plaintiff contends the trial court erred in concluding he was bound by the release and waiver on the reverse side of the roster form. According to plaintiff, the form did not appear to be a contract, but rather simply a roster of names and contact information, and he was accordingly not bound by the form he was "tricked" into signing. (See *Windsor Mills, Inc. v. Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987 [party "not bound by inconspicuous allegedly contractual provisions of which he was unaware and which are contained in a document whose contractual nature is not obvious"]; *Steven v. Fidelity & Casualty Co.* (1962) 58 Cal.2d 862, 883 [exclusionary clause in air travel insurance sold in vending machine should not be enforced in the absence of plain and clear notification to insured]; *McQueen v. Tyler* (1943) 61 Cal.App.2d 263, 265–266, overruled on another ground in *Hischemoeller v. Nat. Ice Etc. Storage Co.* (1956) 46 Cal.2d 318, 328 [clause in moving company's freight bill limiting its liability in "extremely small print" not enforced where plaintiff signed document without reading it, when it was too dark to read, in reliance on mover's representation that document was authorization to take the goods being moved].)

" 'Fraud in the execution' means that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all; since mutual assent is lacking, the contract is void. [Citation.] However, a contract will not be 'considered void due to the fraud if the plaintiff had a reasonable opportunity to discover the true terms of the contract. The contract is only considered void when the plaintiff's failure to discover the true nature of the document executed was without negligence on the plaintiff's part. [Citation.] [¶] . . . Reasonable diligence requires a party to read a contract before signing it.' " (*Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1080 (*Rosencrans*); see also *Duffens v. Valenti* (2008) 161 Cal.App.4th 434, 449.)

*Rosencrans* is instructive.  The plaintiff there signed a document titled " 'Release and Waiver of Liability Assumption of Risk and Indemnity Agreement' " before riding at a motocross track.  (*Rosencrans*, *supra*, 192 Cal.App.4th at p. 1076.)  Underneath approximately nine paragraphs setting forth the waiver and release, there was a section for patrons to sign their names over the words " 'I have read this release.' "  The plaintiff was given the document on a clipboard, and told, " ' "Here, just sign in," ' " or " ' "Here, sign this." ' "  (*Ibid.*)  He signed within about 10 seconds of the document being handed to him, and was not given a copy.  (*Id.* at p. 1077.)  The plaintiff later asserted the title of the document was obscured by the clipboard's metal clip.  (*Id.* at p. 1078.)  He was injured while riding at the track, and sued the operator of the track.  (*Id.* at p. 1077.)  The operator of the track moved for summary judgment, which the trial court granted.  (*Id.* at p. 1076.)  On appeal, the court rejected the plaintiff's argument that the release was unenforceable, concluding there was nothing indicating the plaintiff was prevented from reading the release and discovering its true terms, and hence he had waived his right to sue the operator for ordinary negligence.  (*Id.* at pp. 1080–1081.)

Plaintiff contends the rule of *Rosencrans* is not applicable because the language on the roster form did not clearly show the document was a release.  He points out that the front of the form—the side he signed—is not titled a release or a contract, but rather "2008 Fall Men's Softball League Softball Roster Form."  Furthermore, he contends, there is no language on the front of the form saying that anyone who fills out the roster agrees to be bound by the provisions on the back of the form.

" 'A written release may exculpate a tortfeasor from future negligence or misconduct.  [Citation.]  To be effective, such a release "*must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties*."  [Citation.]  The release need not achieve perfection.  [Citation.]  Exculpatory agreements in the recreational sports context do not implicate the public interest and therefore are not void as against public policy.  [Citations.]  [¶] The determination of whether a release contains ambiguities is a matter of contractual construction.  [Citation.]  . . . If an ambiguity as to the scope of a release exists, it should normally be construed against the drafter. ' "

7

(*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1485, quoting *Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356–1357 (*Benedek*).)

We agree with the trial court that plaintiff is bound by the release. Although the side of the form that plaintiff signed is not titled "Release" or "Waiver," it states in italics, immediately after the boldfaced, all-capital advisement that all players must sign before they can play, that players signing the form acknowledge "that they have read and understand all of the provisions of the waiver and release form on the reverse side of this form." At the top of the signature column are the words, "*Read Waiver Before Signing*." The reverse side of the form is titled "2008 Fall Men's Softball League [¶] Softball League Roster & Release of Liability," includes explicit language pointing out the danger of sliding into base, and states in clear, unambiguous terms that by signing the form the player agrees to the terms of the waiver and release. Although plaintiff stated that he arrived late to practice and was in a hurry, there is no basis to conclude he was prevented from reading the entire form before signing it. On these facts, he is bound by the terms of the waiver.

## C. Gross Negligence

For the first time on appeal, plaintiff contends that even if he is bound by the release, it cannot operate to exculpate the City from its gross negligence. Plaintiff is correct that "an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 750; see also *Rosencrans*, *supra*, 192 Cal.App.4th at p. 1081.)

We reject this argument for two reasons. First, plaintiff has forfeited it by failing to raise it below. " 'It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which the case was tried. Stated otherwise, a litigant may not change his or her position on appeal and assert a new theory. To permit this change of strategy would be unfair to the trial court and the opposing litigant.' " (*Paterson v. City of Los Angeles* (2009) 174 Cal.App.4th 1393, 1401.)

8

In any case, even if we were to exercise our discretion to consider the issue, we would reject plaintiff's position. "Gross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages. [Citation.] However, to set forth a claim for 'gross negligence,' the plaintiff must allege extreme conduct on the part of the defendant. [Citation.] The conduct alleged must rise to the level of 'either a " ' "want of even scant care" ' " or " ' "an extreme departure from the ordinary standard of conduct." ' " [Citations.]' [Citation.]" (*Rosencrans*, *supra*, 192 Cal.App.4th at p. 1082.) Nothing in the complaint alleges a gross departure from the normal standard of conduct, and the evidence plaintiff submitted in opposition to the motion for summary judgment is insufficient to show an extreme departure from an ordinary standard of care.[1]

**D. Civil Code Section 1668**

Plaintiff contends, however, that the pre-dispute release could not exculpate a governmental defendant from its statutory liability for a dangerous condition of public property. For this, he relies on two statutory provisions. First, Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Second, Government Code section 835 provides that, "[e]xcept as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition

---

[1] In *City of Santa Barbara v. Superior Court*, *supra*, 41 Cal.4th at p. 767, our Supreme Court "emphasize[d] the importance of maintaining a distinction between ordinary and gross negligence, and of granting summary judgment on the basis of that distinction in appropriate circumstances." This is such a circumstance.

9

under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." Read together, plaintiff contends, these two statutes establish that the release could not exempt the City from its statutory liability for damages caused by a dangerous condition of public property.

" '[No] public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . .' [Citation.] . . . 'Despite its broad language, section 1668 does not apply to every contract.' [Citation.] 'It will be applied only to contracts that involve "the public interest." [Citations.]' [Citation.]" (*Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 598.) It is well established that " 'although exculpatory clauses affecting the public interest are invalid [citation], exculpatory agreements in the recreational sports context do not implicate the public interest.' [Citations.]" (*Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 739; see also *Benedek*, *supra*, 104 Cal.App.4th at p. 1357.)

Plaintiff contends that although the pre-dispute release was made in the recreational sports context (and hence does not implicate the public interest), we should hold it unenforceable here because his claim for dangerous condition of public property is based on a violation of law for purposes of Civil Code section 1668. He relies on *Capri v. L.A. Fitness International, LLC* (2006) 136 Cal.App.4th 1078 (*Capri*) and *Health Net of California, Inc. v. Department of Health Services* (2003) 113 Cal.App.4th 224 (*Health Net*). Each of those cases held that Civil Code section 1668 invalidated contract clauses seeking to relieve a party from responsibility for future statutory and regulatory violations, regardless of whether the public interest was affected. (*Health Net*, *supra*, 113 Cal.App.4th at p. 235; *Capri*, *supra*, 136 Cal.App.4th at pp. 1084–1087.) In *Capri*, the defendant was alleged to have violated statutes requiring it to maintain public swimming pools, including their " 'structure, appurtenances, operation, source of water supply, amount and quality of water recirculated and in the pool, method of water purification, lifesaving apparatus, measures to insure safety of bathers, and measures to insure personal cleanliness of bathers,' " in a sanitary, healthful, and safe manner. (136

10

Cal.App.4th at pp. 1084–1085; Health & Saf. Code §§ 116040 & 116043.)  These provisions were part of a "detailed regulatory scheme which includes construction standards, safety standards, and sanitation requirements for public swimming pools" and provided for inspections, abatement of nuisances, and "perhaps most importantly, it criminalizes any violation." (*Capri*, 136 Cal.App.4th at p. 1085.)  In *Health Net*, the Department of Health Services violated Welfare and Institutions Code section 14087.305, subdivision (j), and its implementing regulations by assigning all Medi-Cal patients in a particular county who had failed to select a health plan to the same plan rather than distributing them equitably among participating plans. (*Health Net*, *supra*, 113 Cal.App.4th at p. 227.)

Thus, in both *Capri* and *Health Net*, the statutes in question were part of a detailed scheme under which obligations were imposed by statute or regulation.  Here, on the other hand, the applicable statute simply codifies the common law under which an entity is liable for a dangerous condition of its property and sets the conditions under which a public entity will be held liable for such a condition. (See *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1139 ["negligence under section 835, subdivision (a), is established under ordinary tort principles concerning the reasonableness of a defendant's conduct in light of the foreseeable risk of harm"]; see also Legis. Com. com., 32 pt. 2 West's Ann. Gov. Code (2012 ed.) foll. § 835, p. 99 ["Subdivision (b) declares the traditional basis for holding an entity liable for a dangerous condition of property"].)  The court in *Capri* recognized this distinction, noting that the defendant there was being held liable not for "the broad statement of negligence expressed in Civil Code section 1714," but for violation of "a detailed regulatory scheme" which includes construction standards, safety standards, and sanitation requirements for public swimming pools, provides for

inspection by public safety officers, and imposes criminal liability.[2] (*Capri*, *supra*, 136 Cal.App.4th at p. 1085.) In these circumstances—and bearing in mind that the public interest is not implicated—Civil Code section 1668 does not prevent the City from entering into the release.

## III. DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Humes, J.

---

[2] Civil Code section 1714 provides in pertinent part: "(a) Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want or ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself."