Filed 5/7/13  Shawa v. City of Fairfield CA1/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RAGDA SHAWA,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF FAIRFIELD et al.,<br><br>        Defendants and Respondents. | A133377<br><br>(Solano County<br>Super. Ct. No. FCS035185) |

Ragda Shawa was injured while participating in a senior day program (the Program) operated by the City of Fairfield (Fairfield).  She sued Fairfield and the Program for negligence.  Defendants moved successfully for summary judgment based on a waiver of liability clause Shawa signed as a condition of her admission to the Program.  On appeal, Shawa contends the waiver is unenforceable on public policy grounds or, alternatively, too uncertain in its effect to be enforced.  We agree with the former contention, and reverse the judgment.

## I.  BACKGROUND

Shawa sued Fairfield and the Program for damages, alleging she fell in the bathroom on February 26, 2009 while attending the Program as a result of defendants' negligence.  Defendants moved for summary judgment on the grounds that before Shawa began attending the Program, Shawa's daughter signed a valid "Waiver of Liability" on behalf of herself and Shawa releasing Fairfield and its agents and employees from liability based on negligence or carelessness for any personal injury Shawa might sustain as a result of her participation in the Program.

**A.** *Defendants' Undisputed Facts*

Defendants assert the following facts are undisputed:

Shawa had undergone surgery (a craniotomy) to remove a brain tumor in 1995, which left her with aphasia (impairment of the power to use or comprehend words) and limited speech. She was 56 years old at the time of her admission to the Program in 2007.

The Program is operated through Fairfield's Community Resources Department and is overseen and licensed by the Community Care Licensing Division of the California Department of Social Services. The Program provides comprehensive social and educational services to frail and isolated seniors, including social, physical and therapeutic activities. The purpose of the Program was to give people like Shawa the opportunity to get out of their homes and interact with others.

Shawa was admitted to the Program in August 2007. She was placed in it by her daughter, Dana Shawa, with whom she lived in Fairfield. The Program is designed to provide social and recreational activities to participants who use walkers and even wheelchairs. Dana observed other participants in wheelchairs and walkers at the facility. The fact that Shawa used a walker did not preclude her from being in the Program. However, Shawa and her daughter were aware the Program did not provide medical care or treatment to its participants and did not provide any professional nursing care. The admission agreement stated that if the participant began to require skilled nursing care or required more care or supervision than the Program could provide, she would be discharged.

The admission agreement included the following waiver of liability clause: "In consideration of the acceptance of my application to the Senior Day Program, I hereby waive, release, and discharge all claims for damages for death, personal injury and property damage which I may have or that may hereafter accrue to me, as a result of participation in said event. This release is intended to discharge, indemnify, and hold harmless the City of Fairfield, its officers, employees or agents from liability even though that liability may arise out of negligence or carelessness on the part of the persons or

2

entities mentioned above. Some recreational activities involve an element of risk or danger of accidents, and knowing those risks, I hereby assume those risks." Dana testified she understood the plain language of the waiver and that it would bar Shawa's claims.

In connection with her admission to the Program, Shawa was evaluated by her physician, Dr. Dina Nguyen, who noted Shawa's primary diagnosis was a seizure disorder as a result of a partial craniotomy. Dr. Nguyen indicated Shawa did not need constant medical supervision, and basically was able to care for her personal needs and daily living activities. Dr. Nguyen noted Shawa was able to ambulate in her walker without assistance.

Before Shawa began the Program, she would stay at home by herself while Dana went to work. Dana testified her reason for getting Shawa admitted into the Program was so Shawa would not be at home watching TV all day. Dana wanted her to interact with other people and do social and recreational type activities. Shawa attended the Program on Mondays, Tuesdays, and Wednesdays at a cost to the Shawas of $40 per day. There was no necessity for Shawa to attend because she could have continued staying home on those days while Dana worked.

After Shawa's admission to the Program, a care plan was created on November 26, 2007, which outlined social goals for Shawa. The care plan notes Shawa was able to take care of her own ADL's (activities of daily living). At the point the care plan was created, Shawa had been attending for several months and the care plan notes the Program had been wonderful for Shawa, and she was very social and loved attending. The care plan goals were encouraging Shawa to speak and sing, participate in physical and other appropriate social activities, and provide caregiver education and support to Dana. A September 2008 care plan is virtually identical to the November 2007 care plan.

Shawa fell in the bathroom on November 20, 2008, but returned to the Program uninjured. When Shawa returned to the Program, she did not exhibit any behavior or condition that would indicate she required more care and supervision than the Program could provide. Prior to her fall on February 26, 2009, there was no information to

3

suggest Shawa needed skilled nursing care. Shawa did not exhibit any changes in condition described in the admission agreement that would indicate she needed more care or supervision than the Program could provide. Dana did not talk to anyone at the Program about any additional supervision she thought Shawa might need.

Shawa suffered personal injuries on February 26, 2009, when she fell in the bathroom while using her walker and being assisted by a Program staff member.

## B. *Shawa's Opposition*

In opposition to defendants' summary judgment motion, Shawa disputed that the Program is limited to social and educational services. Shawa adduced evidence the Program also provides health support and therapeutic services.[1] She emphasized the Program created a *care* plan for her, indicating more was involved than mere recreation and socializing. Shawa cited Fairfield's Web site which described the Program as a "social day care program" for seniors who need "supervision, assistance, and social interaction," and which also provided "a variety of health, social, and other related support services." According to the Web site, the Program is "excellent for individuals who are frail and isolated during the day," offering them "[a]ffordable care in an enriching environment." The Web site advertises that Program participants include those with memory loss, traumatic brain injury, stroke, Parkinson's disease, multiple sclerosis, or cognitive impairment. Stated Program benefits included physical and mental stimulation and opportunities for participation in therapeutic activities, as well as respite and education for participants' families and caregivers. Shawa's opposition highlighted the fact the Program is a state-licensed and regulated program, and its services are important to the public. The California State Legislature made a specific finding in Health and Safety Code section 1501, undisputed by Fairfield, that there was an urgent

---

[1] There is no dispute the Program did not provide medical or nursing care to its participants. By regulation, however, the Program was required to provide health support in the form of necessary first aid, assistance with self-administration of prescription and nonprescription medications, including safe storage, and assistance where needed in the use of devices and aids, such as oxygen equipment, prosthetic devices, or hearing aids. (Cal. Code Regs., tit. 22, § 82075.)

4

need for community care for disabled adults.  Citing the deposition testimony of the Program director, Shawa also asserted the Program possessed bargaining strength relative to Shawa because it was the only viable adult senior day program in Solano County. Shawa was required to agree to the waiver of liability as a condition of admittance into the Program.  There was no provision whereby a participant could pay additional fees for protection against negligence.

Shawa first fell in 2008, when she was in the bathroom by herself.  After that incident, Program employees were directed to accompany Shawa when she used the restroom.  In the 2009 fall, Shawa was being walked to the restroom by a Program employee.  As they approached the bathroom stall, the employee left Shawa unattended while she walked ahead of her to open the door.  Shawa fell and hit the back of her head.

## C.  *Trial Court Ruling, Judgment, and Appeal*

The trial court granted defendants' motion for summary judgment.  It found the waiver of liability clause covered the incident in which Shawa sustained her injuries, and was valid and enforceable.  The court found as a matter of undisputed fact the adult day services offered by defendants were recreational in nature and did not include medical treatment.  Relying principally on *YMCA of Metropolitan Los Angeles v. Superior Court* (1997) 55 Cal.App.4th 22 (*Metro YMCA*), which upheld the enforceability of a liability waiver in a case arising from a fall by a 73-year-old woman at a YMCA senior program, the court found the release at issue in this case was not contrary to public policy.

Shawa timely appealed from the ensuing judgment.

## II.  DISCUSSION

Shawa contends the trial court erred by not finding triable issues of material fact as to whether the waiver was (1) unenforceable since the services provided by the Program implicate the public interest, and (2) ineffective because its terms are insufficiently clear and explicit.

## A.  *Standard of Review*

On appeal from a summary judgment in favor of the defendants, we conduct an independent review, applying the same process as the trial court.  (*AARTS Productions,*

*Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064–1065.) We examine the moving parties' motion to see whether it shows "one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action." (Code of Civ. Proc., § 437c, subd. (p)(2).) If the moving party has made the requisite showing, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (*Ibid.*) If the opposing party fails to sustain this burden of showing the cause of action has merit, summary judgment is proper. (Code of Civ. Proc., § 437c, subds. (c), (p)(2).)

" ' " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.' " (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.)

There is no dispute defendants' waiver of liability of clause would provide a complete defense to Shawa's negligence claim if it is valid and enforceable. Defendants therefore met their initial burden. The issue before us is whether Shawa's evidence, and the reasonable inferences that may be drawn from it, are sufficient to create a triable issue of material fact with respect to the enforceability of the waiver clause on public policy grounds.

**B.** *Enforceability of the Waiver Clause*

A contract clause purporting to waive liability for negligence may violate public policy when it exhibits some of the following factors set forth by the California Supreme Court in *Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92 (*Tunkl*): "[(1)] It concerns a business of a type generally thought suitable for public regulation. [(2)] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [(3)] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [(4)] As a result of the essential nature of the service, in the

6

economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.  [(5)] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.  [(6)] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id*. at pp. 98–101, fns. omitted.)

The plaintiff in *Tunkl* was accepted as a charity patient in defendant's nonprofit medical research center on condition he sign a release of liability for negligent or wrongful acts or omissions by the hospital's employees.  (*Tunkl, supra,* 60 Cal.2d at p. 94.)  Under the facts of that case, the California Supreme Court held that an exculpatory provision in favor of a party whose business involves the public interest is void.  *Tunkl* recognized, as a general rule, "no public policy opposes private, *voluntary* transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party . . . ." (*Id.* at p. 101, italics added.)  However, what distinguishes transactions exhibiting some or all of the enumerated factors is, "the releasing party *does not really acquiesce voluntarily* in the contractual shifting of the risk" but, rather, is *forced* to assume the risk of another's negligence because the service is essential.  (*Ibid.*, italics added.)

Thus, *Tunkl* does not invalidate releases of ordinary negligence for injuries arising from sports and recreational activity.  Courts have upheld such releases reasoning that, although beneficial, sports and recreational activities are not services essential to the public and do not involve the public interest. (See, e.g., *Lund v. Bally's Aerobic Plus, Inc.* (2000) 78 Cal.App.4th 733, 737 [health club]; *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 162 (*Randas*) [swimming]; *Okura v. United States Cycling Federation* (1986) 186 Cal.App.3d 1462, 1467 [bicycling].)

On the other hand, exculpatory clauses have been found unenforceable based on the *Tunkl* factors in the following illustrative cases cited by Shawa, none of which

involved services as essential to the public as medical care: *Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662, 670–676 (finding child care program was an essential activity for working families, not a recreational activity); *Gardner v. Downtown Porsche Audi* (1986) 180 Cal.App.3d 713, 717–720 (finding auto repair shop provided a service of great practical importance and necessity to the public); *Akin v. Business Title Corp.* (1968) 264 Cal.App.2d 153, 157 (escrow agents perform an important public service and it is often a practical necessity to use the designated agent, giving them a decisive advantage in bargaining).

Here, the trial court relied primarily on *Metro YMCA*. In that case, the plaintiff attended a senior program that offered limited recreational activities and an inexpensive lunch. (*Metro YMCA*, *supra*, 55 Cal.App.4th at pp. 25, 27.) She fell and injured herself as she was walking near tables displaying jewelry and other items for program participants to purchase. (*Id.* at pp. 24–25.) The *Metro YMCA* court upheld an exculpatory clause program participants were required to sign, reasoning as follows: "The release exhibited none of the coercive aspects typically found in an adhesion contract. *The program's simple recreational offerings of games, socializing, shopping, and eating lunch, were not so essential as to rob plaintiff of her free will in deciding whether to sign the release.* Reasonable minds must agree plaintiff was not precluded by signing the release from finding another senior center or club more to her liking had she wished to do so." (*Id.* at pp. 27–28, italics added.)

Plaintiff seeks to distinguish *Metro YMCA* on the basis that unlike the Program in issue here, the senior program in *Metro YMCA* "did not provide supervision, care, or therapeutic services to isolated, frail, or disabled adults." Further, unlike Shawa, the plaintiff in *Metro YMCA* was not disabled, incapable of going out on her own, and in need of care or supervision, and the YMCA senior program had not obtained a medical report and developed a care plan for her including activities to help her overcome her disabilities. At oral argument, Fairfield conceded *Metro YMCA* is distinguishable in that it did not involve adults with special needs for supervision and assistance who must be

8

screened by a physician before they can enter the Program. We therefore find the trial court erred in relying on *Metro YMCA*.

A liability waiver clause may be found unenforceable on public policy grounds even if one or more of the factors identified in *Tunkl* is not present. (*Tunkl*, *supra*, 60 Cal.2d at p. 101; *Gardner v. Downtown Porsche Audi*, *supra*, 180 Cal.App.3d at p. 717.) But construing Shawa's evidentiary submissions liberally, and resolving doubts or ambiguities in her favor (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th at p. 768), we find that all or nearly all of the *Tunkl* factors do in fact apply here.

First, there is no dispute the Program is of a type thought suitable for public regulation. Adult day programs like Fairfield's are licensed and regulated by the State Department of Social Services pursuant to the California Community Care Facilities Act, Health and Safety Code section 1500 et seq. Such programs are subject to extensive regulations promulgated under the Act's express authority. (See Health & Saf. Code, § 1530; Cal. Code Regs., tit. 22, § 82000 et seq. [regulations for adult day programs].) Of some significance, an adult day program is defined by statute as follows: " 'Adult day program' means any community-based facility or program that *provides care* to persons 18 years of age or older *in need of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual* on less than a 24-hour basis." (Health & Saf. Code, § 1502, subd. (a)(2), italics added.)

Second, the evidence supports an inference the Program is "engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public." (*Tunkl*, *supra*, 60 Cal.2d at pp. 98–99, fns. omitted.) Fairfield conceded the Program provided an important service to the public, although it denied the service was "vital," and insisted the evidence showed the Program was not a necessity for Shawa, because she could have continued to stay at home. But we do not confine our analysis to whether the program was a practical necessity for Shawa herself. Under *Tunkl*, the issue is whether the service is a practical necessity for *some* members of the public. Viewing the evidence in the light most favorable to Shawa, we believe she has shown this factor applies. The Legislature in section 1501 of the Health and Safety

9

Code found there is "an urgent need" for community care programs for, among others, adults who are developmentally and physically disabled, like those for whom the Program is designed. The statutory definition of "adult day program," cited above, suggests that programs like Fairfield's are for persons *in need of* supervision and assistance *essential* for sustaining their activities of daily living or for protecting them. Fairfield's Web site confirms the Program serves those who need supervision and assistance, as well as social interaction. It advertises that it is for "isolated, frail or impaired adults," including those suffering from substantial physical and cognitive deficits including traumatic brain injury, stroke, Parkinson's disease and other conditions. While as Fairfield points out, Shawa did not come forward with any direct evidence the Program is a practical necessity for some participants and their families, we believe it is reasonable to infer from the nature of the Program as defined by statute, and from the manner in which the Program presents itself to the public, that it provides an important service that is a practical necessity for some. The parties agree this is the most important of the *Tunkl* factors because it goes to the "essence of the *Tunkl* policy [which] is that individuals should not be compelled by practical necessity to agree to limitations of liability." (*McCarn v. Pacific Bell Directory* (1992) 3 Cal.App.4th 173, 182.)

The third *Tunkl* factor also applies—the party seeking exculpation from negligence "holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards." (*Tunkl, supra*, 60 Cal.2d at p. 99, fn. omitted.) Here, although Fairfield reserves the right to deny service to persons whose needs for care and supervision exceeds the Program's capabilities, it does hold itself out as willing to provide the service to all who meet its standards. Fairfield concedes the Program "is open to all participants meeting certain criteria."

The fourth *Tunkl* factor is whether "[a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services." (*Tunkl, supra,* 60 Cal.2d at pp. 99–100, fn. omitted.) Shawa

points to the somewhat ambiguous deposition testimony of the Program's director that "there isn't really a viable [adult day] program in Solano County." Fairfield countered with evidence Shawa was able to find a satisfactory program in Marin County after her fall. But even if a few other programs existed within driving range, this would not necessarily negate the Program's bargaining power over persons in Shawa's position. "[T]he test is not whether the [Fairfield program] is the *only* [adult day] program available, but whether [such programs are] a 'practical necessity' provided by a relatively small number of entities." (*Gavin W. v. YMCA of Metropolitan Los Angeles*, *supra*, 106 Cal.App.4th at p. 673.) Viewing the evidence in the light most favorable to Shawa (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843), there is at least a triable issue of fact as to whether the Program possessed a decisive advantage in bargaining strength relative to those families who seek out its services.

The fifth *Tunkl* factor is whether the Program offers "a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence." (*Tunkl, supra*, 60 Cal.2d at pp. 100–101, fns. omitted.) It was undisputed Shawa was required to agree to the waiver of liability as a condition of admittance into the Program, and no option was offered for her to pay more for protection against negligence.

The final *Tunkl* factor is whether "as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Tunkl, supra*, 60 Cal.2d at p. 101, fn. omitted.) There is no question Shawa was placed in the Program's care and control on the days she attended, and was subject to the risk of carelessness by its employees.

Despite Shawa's failure to produce any direct evidence the Program was a practical necessity, either for her personally or for some of its participants, summary judgment was improperly granted in this case. Shawa was entitled to an inference the Program is a practical necessity for some based on the nature and description of adult day programs as defined by statute, and the manner in which Fairfield itself promotes and describes the Program on its Web site. By its nature the Program serves frail, isolated, or

11

impaired individuals, many with serious physical or cognitive deficits, who "need" assistance, supervision, and health support services "essential" for their daily living or protection during part of the day, as well as providing respite and counseling for their families. (Health & Saf. Code, § 1502, subd. (a)(2).) Although Shawa herself may have had the option of staying at home by herself, it is reasonable to infer that alternative may often not be available to other prospective participants and their families. Any doubt or ambiguity on that score must be resolved in Shawa's favor. We also reject the notion that a state-licensed and regulated program of this nature, found by legislative declaration to meet an urgent need, should be equated to purely recreational programs such as the swimming program at issue in *Randas* or the senior lunch program in *Metro YMCA* for purposes of evaluating whether Fairfield's attempted waiver of negligence liability implicates public policy concerns.

For these reasons, we find Fairfield's waiver of liability clause is unenforceable on public policy grounds, and summary judgment was therefore improperly granted.[2]

### III. DISPOSITION

The judgment in favor of defendants is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

---

[2] We reject Shawa's further argument the waiver clause is unenforceable because it was unclear what the words "said event" in the clause refer to. Considering the language of the waiver clause as a whole and the subject of the admission agreement of which it is a part, we find no ambiguity. (Civ. Code, § 1647.) The subject of the agreement was Shawa's admission to participate in the Program. The phrase "participation in said event" in that context can only reasonably refer to her participation in the Program. The waiver clause was short, easy to understand, and printed in a readily legible format. It afforded clear notice of the effect of signing, and was not unenforceable for lack of sufficient clarity.

12

_____

Margulies, Acting P.J.

We concur:


_____

Dondero, J.


_____

Banke, J.

13